STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Landray M. HARRIS, Defendant-Appellant.

Supreme Court

*No. 2008AP810–CR. Oral argument October 20, 2009.*
*—Decided July 14, 2010.*

2010 WI 79

(Also reported in 786 N.W.2d 409.)

For the plaintiff-respondent-petitioner there was oral argument by *Rebecca Rapp St. John,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

For the defendant-appellant there was a brief and oral argument by *Michael K. Gould,* assistant state public defender, Milwaukee.

An amicus curiae brief filed by *Kathryn A. Holtz,* Madison, and *Victor Goode* and the *National Association for the Advancement of Colored People,* Baltimore, Md., on behalf of the National Association for the Advancement of Colored People.

¶ 1. MICHAEL J. GABLEMAN, J. Following his conviction and sentencing for drug-related crimes, Landray M. Harris moved for relief from his sentence on the grounds that the court made inappropriate comments reflecting racial and gender stereotypes during the sentencing hearing. The circuit court denied the motion, and in an unpublished opinion,[1] the court of appeals reversed and held that the defendant was entitled to resentencing.

---

[1] *State v. Harris,* No. 2008AP810–CR, unpublished slip op. (Wis. Ct. App. Jan. 21, 2009).

¶ 2. This case concerns the proper legal principles that govern review of a sentence when a defendant claims the circuit court imposed its sentence on the basis of race or gender. The court of appeals adopted, and Harris endorses, a new "reasonable observer" test which queries whether the circuit court's comments suggest to a reasonable observer that the court improperly relied on race or gender when imposing its sentence. The State maintains that a reasonable observer's perception of the court's comments is not indicative of whether the court improperly relied on race or gender.

¶ 3. We agree with the State and reject the reasonable observer test created by the court of appeals. Sentencing decisions are afforded a presumption of reasonability consistent with Wisconsin's strong public policy against interference with a circuit court's discretion. Our review of sentencing decisions is therefore limited to determining whether the circuit court erroneously exercised its discretion. Discretion is erroneously exercised when a sentencing court actually relies on clearly irrelevant or improper factors, and the defendant bears the burden of proving such reliance by clear and convincing evidence. It is beyond dispute that race and gender are improper factors; they may not be relied upon—at all—in the imposition of a sentence.

¶ 4. After reviewing the sentencing transcript in context and as a whole, we conclude that Harris has not met his burden of proving by clear and convincing evidence that the circuit court actually relied on race or gender. The circuit court considered the proper factors—it evaluated the gravity of the offense, Harris's character, and the public's need for protection. The circuit court thoroughly explained its reasons for the sentence it imposed, and all of the potentially offensive comments flagged by both Harris and the court of

689

appeals bear a reasonable nexus to proper sentencing factors. Because Harris has not shown that the circuit court erroneously exercised its discretion, we reverse the decision of the court of appeals.

## I. FACTS

¶ 5. On May 14, 2007, Landray M. Harris pled guilty to possession of cocaine with intent to deliver in violation of Wis. Stat. §§ 961.41(1m)(cm)2. and 939.05 (2005–06).[2] On August 15, 2007, Harris had a sentencing hearing before the Honorable Joseph R. Wall of the Milwaukee County Circuit Court. The interaction between Harris and the court during this sentencing hearing forms the basis for the issues before us today, and will therefore be quoted at length.

¶ 6. The circuit court first discussed the presentence investigation report and other related matters with the attorneys. Among the items noted was a picture of Harris at a club with known gang members in which, as the court later noted, Harris appeared to be "throwing gang signs." The court then began an extended discussion with Harris.

¶ 7. Harris stated that he was not intending to make a career out of selling drugs, although he admitted he had been doing it for a number of months. Harris said that he is quick to learn from his mistakes, that he knew what he was doing was wrong, and that he did not want to hurt his daughter. The circuit court inquired further regarding Harris's daughter, who was soon to turn two.

¶ 8. The conversation then turned to Harris's employment, and the following exchange ensued:

---

[2] All subsequent references to the Wisconsin Statutes are to the 2005–06 version unless otherwise indicated.

The Court: Where are you working now?

The Defendant: I'm unemployed right now.

The Court: You're unemployed still?

The Defendant: Yes.

The Court: Have you gotten a job since January?

The Defendant: No, sir.

The Court: You're kidding.

The Defendant: No.

The Court: What do you do all day?

The Defendant: I just stay at home with my daughter and that's it.

The Court: Where is her mother?

The Defendant: At work.

The Court: So the mother works and you sit at home, right?

The Defendant: Yeah.

The Court: And watch the child?

The Defendant: I got all types of things goin'. My personal family.

¶ 9. The court next inquired about the mother of Harris's daughter:

The Court: Where does the baby's mama work?

The Defendant: Metro Market.

The Court: Did she finish school?

691

The Defendant: Yes.

The Court: Is she going to college, too?

The Defendant: Yes.

The Court: Where do you guys find these women, really, seriously. I'd say about every fourth man who comes in here unemployed, no education, is with a woman who is working full-time, going to school. Where do you find these women? Is there a club?

The Defendant: No.

The Court: You're sure?

The Defendant: I ain't find her at—she not the club [type].

The Court: Oh, she's not the club type. I need the truth now, when was the last time you smoked marijuana?

The Defendant: Yesterday.

¶ 10. The court concluded its conversation with Harris by discussing Harris's alleged gang involvement —which Harris denied—and by noting his expensive clothing as reflected in the above-noted photograph, clothing which Harris admitted was partially financed by his drug dealing.

¶ 11. After a brief conversation with the attorneys regarding the pants Harris was wearing when arrested, which contained a "secret pocket" designed to store drugs, the court went into a lengthy discussion of sentencing factors. The court noted that it needed to consider the gravity of the offense, the background of the defendant, and the need to protect the public.

¶ 12. Regarding the gravity of the offense, the court concluded that the crime was serious. It emphasized the horrible and addictive nature of crack cocaine,

and how it destroys families and lives. The court discussed how this often affects women, whose drug addictions cause them to lose parental rights to their children. The court noted that "[t]he men are always out of the picture"; they are "on the street corners with Mr. Harris here smoking pot and throwing gang signs with their idiot buddies." The court further emphasized how this drug drags individuals, families, and neighborhoods down.

¶ 13. The court also discussed how demand for cocaine affects people around the world, noting that the vast majority of our heroin comes from Afghanistan where our soldiers are serving and dying. The court then stated:

> It's the same thing with cocaine. People Mr. Harris's age [are] enlisting in the Marines and Army and National Guard, putting their lives at stake while Mr. Harris sits at home, gets high while his baby mama works and goes to school. I swear there's a club where these women get together and congregate.

¶ 14. The court then examined Harris's character and background, which it called "completely unimpressive." The court discussed Harris's drug dealing, and noted that Harris eschewed looking for a job even though good jobs were available. The court commented:

> Well, they're getting high and it's much easier to get high than work and work hard eight hours a day and make the amount of money that they pay. These are jobs that will pay benefits; paid vacation, medical care for your daughter. I'm sure your wife already is providing that—not your wife, your baby mama is already providing that.

The court emphasized Harris's lack of any employment history, calling it "appalling for a 21 year old person."

¶ 15. The court commented that Harris had not completed his education, and noted that despite the opportunity to get his GED through a government program, Harris simply stopped attending classes.

¶ 16. The court further noted that until he began selling drugs, Harris's mother was his source of income. The court quoted from the impressions of the agent who interviewed Harris for his presentence report (to which Harris was an hour late); the agent had written that Harris seemed to have "this absurd expectation that his mother should be supporting his marijuana habit," and that Harris "is at a minimum a gang wannabe."

¶ 17. Regarding Harris's daughter and his responsibility for her, the court discussed how dangerous the drug dealing business is, the likelihood of missing his daughter's childhood while in prison or dead, and how he was being a "terrible role model" for his daughter.

¶ 18. Next, the court discussed the need to protect the public. Harris seemed not to care about what was happening, the court found, and had not shown any inclination to change.

¶ 19. Finally, the court considered various goals related to sentencing: protecting the public, rehabilitation of the defendant, deterring the defendant from offending again, and deterrence of others.

¶ 20. The circuit court concluded that a strong message needed to be sent. It sentenced Harris to an initial period of confinement of two years, followed by extended supervision for three years.[3]

---

[3] The court also made Harris eligible for boot camp and the Earned Release Program after 12 months, and imposed a fine.

## II. PROCEDURAL HISTORY

¶ 21. On March 7, 2008, Harris filed a motion for resentencing or in the alternative, sentence modification, on the grounds that the sentencing court did not adequately consider mitigating factors, and that the court made sarcastic and inappropriate comments based on stereotypes during the sentencing proceeding. The circuit court, the Honorable Kevin E. Martens now presiding,[4] denied Harris's motion, concluding that the circuit court did not erroneously exercise its discretion. The circuit court explained as follows:

> The court gave adequate consideration to all aspects of the defendant's character as part of the overall factors it must consider at the time of sentencing. [citation omitted] The comments concerning the defendant's unemployment status and the willingness of his child's mother to go out and work and go to school while the defendant sat home were meant to express incredulity over a 21 year old able-bodied male allowing the child's mother to go out and work instead of going out and finding a job on behalf of his family and furthering his financial prospects. The court finds this to be an appropriate consideration of the defendant's character for sentencing purposes and declines to modify the sentence or resentence the defendant on any basis set forth in the defendant's motion.

¶ 22. On review, the court of appeals agreed that the circuit court properly considered and weighed all appropriate factors. *State v. Harris,* No. 2008AP810–CR, unpublished slip op., ¶¶ 6, 10 (Wis. Ct. App. Jan. 21, 2009). It also surmised that the circuit court "did not

---

[4] Judge Martens took over Judge Walls' drug court docket as part of Milwaukee County's judicial rotation system.

harbor bias against Harris because of his race."[5] *Id.*, ¶ 16. Nevertheless, the court of appeals concluded that several of the circuit court's comments "suggest to a reasonable observer, or a reasonable person in the position of the defendant, that the trial court was improperly considering Harris's race when it imposed sentence." *Id.*, ¶ 18. Because of this, the court of appeals held that the circuit court erroneously exercised its discretion. It vacated Harris's sentence and remanded the matter for resentencing. *Id.*, ¶¶ 10, 18.

¶ 23. The State petitioned this court for review, which we accepted.[6]

## III. DISCUSSION

¶ 24. In this case, Harris claims that the circuit court relied on race and gender when sentencing him, and that because it did so, the circuit court erroneously exercised its discretion. Thus, Harris maintains he is entitled to resentencing.

---

[5] The court of appeals did not consider whether the circuit court improperly sentenced Harris on the basis of gender because its conclusion that the circuit court improperly relied on race was sufficient to dispose of the case. *See State v. Harris,* No. 2008AP810–CR, unpublished slip op., ¶ 10 n.4.

[6] Justice Bradley's assertions to the contrary (*see* concurrence, ¶ 70), the phrase "appearance of bias" does not even appear in the State's statement of issues in its petition for review. Instead, the petition for review asked this court to resolve a specific, defined issue: whether "comments suggesting a circuit court considered a defendant's race at sentencing provide an independent basis for vacating a sentence? Or must defendants continue to establish that a circuit court actually relied on irrelevant or improper facts like race?"

¶ 25. The crux of this case centers on how courts should analyze whether a sentencing court actually relied on race or gender.[7]

---

[7] Justice Bradley wants this case to be something it is not. It is all about "appearance of bias" she tells us. *See* concurrence, ¶¶ 68–70. She is wrong.

Justice Bradley's analysis relies largely on three cases: *Crawford v. United States,* 212 U.S. 183 (1909) (*see* concurrence, ¶¶ 73, 88); *State v. Gudgeon,* 2006 WI App 143, 295 Wis. 2d 189, 720 N.W.2d 114 (*see* concurrence, ¶¶ 89–91); and *State v. Goodson,* 2009 WI App 107, ¶ 18, 320 Wis. 2d 166, 771 N.W.2d 385 (*see* concurrence, ¶¶ 93–95). Yet *none* of these cases were even cited by the parties in their briefs, and none are relevant.

In *Crawford,* the United States Supreme Court was not reviewing a judge's alleged bias or prejudice; indeed, the "judge's mind" was of no relevance. *See Crawford,* 212 U.S. at 196. Instead, the Supreme Court held that a United States Post Office employee could not serve as a juror in the prosecution of a defendant charged with conspiracy to defraud the post office. *Id.* at 192–97.

In *State v. Goodson,* 2009 WI App 107, 320 Wis. 2d 166, 771 N.W.2d 385, a judge promised to sentence a defendant to the maximum period of time if he violated his supervision rules. *Id.,* ¶ 13. The claim in *Goodson* was that the circuit court prejudged the reconfinement sentence, not appearance of bias. *Id.,* ¶ 6.

For similar reasons, *State v. Gudgeon,* 2006 WI App 143, 295 Wis. 2d 189, 720 N.W.2d 114, does not indicate the adoption of an "appearance of bias" test for determining whether a judge actually relied on improper sentencing factors. That case, as well, involved a "claim[] that the court was [] biased in favor of a particular result before listening to the evidence." *Id.,* ¶ 1.

In addition, Justice Bradley cites *Caperton v. A.T. Massey Coal Co., Inc.,* 556 U.S. ___, 129 S. Ct. 2252 (2009), which is distinguishable on its face. *See State v. Allen,* 2010 WI 10, ¶¶ 259–72, 322 Wis. 2d 372, 778 N.W.2d 863 (Ziegler, J., concurring). Similarly, the issues in *Allen* are easily distinguishable.

697

¶ 26. Harris asks us to affirm the decision of the court of appeals and adopt a reasonable observer standard. In Harris's view, a circuit court is deemed to have relied on race or gender if a reasonable observer would conclude that his sentence was imposed on the basis of race or gender.[8] The State counters that mere perception by a reasonable observer or defendant does not equate to actual reliance on race or gender.

¶ 27. In Part A, we discuss sentencing generally, review the well-settled legal standards governing review of sentencing decisions, and frame the applicable legal standard from our established case law. In Part B, we take up the court of appeals' reasonable observer test and explain why this approach does not work and why it conflicts with our established sentencing review law. Finally, in Part C, we apply the standards outlined in Part A to the facts of this case, concluding that the circuit court did not erroneously exercise its discretion in sentencing Harris.

A. Sentencing and Review of Sentencing Decisions

¶ 28. Circuit courts must consider three primary factors in determining an appropriate sentence: the gravity of the offense, the character of the defendant, and the need to protect the public. *State v. Harris,* 119 Wis. 2d 612, 623, 350 N.W.2d 633 (1984). Additional related factors the court may consider include:

"(1) Past record of criminal offenses; (2) history of undesirable behavior pattern; (3) the defendant's per-

---

[8] As noted above, the court of appeals did not discuss the gender issue. However, Harris appears to advocate that the reasonable observer standard should apply to gender as well as race.

sonality, character and social traits; (4) result of presentence investigation; (5) vicious or aggravated nature of the crime; (6) degree of the defendant's culpability; (7) defendant's demeanor at trial; (8) defendant's age, educational background and employment record; (9) defendant's remorse, repentance and cooperativeness; (10) defendant's need for close rehabilitative control; (11) the rights of the public; and (12) the length of pretrial detention."

*Id.* at 623–24 (quoting *Harris v. State,* 75 Wis. 2d 513, 519, 250 N.W.2d 7 (1977)). Sentencing courts have considerable discretion as to the weight to be assigned to each factor. *Id.* at 624.

■

¶ 29. In exercising discretion, sentencing courts must individualize the sentence to the defendant based on the facts of the case by identifying the most relevant factors and explaining how the sentence imposed furthers the sentencing objectives. *See State v. Gallion,* 2004 WI 42, ¶ 39–48, 270 Wis. 2d 535, 678 N.W.2d 197.

■

¶ 30. Review of a sentencing decision is "limited to determining if discretion was erroneously exercised." *Id.,* ¶ 17. Discretion is erroneously exercised when a sentencing court imposes its sentence *based on* or in *actual reliance upon* clearly irrelevant or improper factors. *Id.; State v. Tiepelman,* 2006 WI 66, ¶ 26, 291 Wis. 2d 179, 717 N.W.2d 1. Sentencing decisions are afforded a presumption of reasonability consistent with our strong public policy against interference with the circuit court's discretion. *Gallion,* 270 Wis. 2d 535, ¶ 18. Accordingly, the defendant bears the heavy burden of showing that the circuit court erroneously exercised its discretion. *See Id.,* ¶ 72.

699

¶ 31. The question in this case is how a defendant must meet the heavy burden of showing that the sentence was based on improper factors. Or more to the point, how should a reviewing court determine when a circuit court has actually relied on race and gender in imposing its sentence, and therefore erroneously exercised its discretion?

¶ 32. This court clarified the framework in which to answer this and related questions in *Tiepelman*, 291 Wis. 2d 179. In that case, a defendant moved for resentencing on the grounds that the circuit court relied on inaccurate information. *Id.*, ¶ 1. We noted that a defendant has a constitutional due process right to be sentenced based upon accurate information. *Id.*, ¶ 9. The issue was, as here, what the correct standard of review should be. We held that a defendant must prove that the information was inaccurate, and that the court actually relied on that inaccurate information. *Id.*, ¶ 26; *State v. Payette*, 2008 WI App 106, ¶ 46, 313 Wis. 2d 39, 756 N.W.2d 423. If the defendant shows this, the burden shifts to the State to prove that the error was harmless. *Tiepelman*, 291 Wis. 2d 179, ¶ 26.

■

¶ 33. The application of this well-settled law in the case at bar is straightforward. Harris similarly has a constitutional due process right not to be sentenced on the basis of race[9] or gender. No Wisconsin case has held that defendants have a due process right not to be sentenced on the basis of gender. We now so hold because to do so is in conformity with our understanding of the basic tenets of due process. Everyone agrees,

---

[9] *See, e.g., United States v. Munoz*, 974 F.2d 493, 495 (4th Cir. 1992) ("[S]entences imposed on the basis of race or national origin violate due process.").

then, that race and gender are improper factors, and that imposing a sentence on the basis of race or gender is therefore an erroneous exercise of discretion. Consequently, Harris has the burden to prove that the circuit court actually relied on race or gender in imposing its sentence.[10] Because we determine that Harris has not met this burden (as explained in Part C), we need not determine whether the errors alleged here are subject to harmless error analysis, or whether they are structural errors not amenable to harmless error analysis.[11]

¶ 34. Proving that the circuit court relied on race and gender may in some instances be a bit of an amorphous task. But this is true whenever attempting to show that the sentencing court actually relied on any improper factor. We now make clear what has been recognized in factually analogous cases: the standard of proof is clear and convincing evidence. *See State v. Littrup*, 164 Wis. 2d 120, 131–32, 473 N.W.2d 164 (Ct. App. 1991) (applying the clear and convincing evidence burden to a due process claim of improper sentencing

---

[10] *Tiepelman* established a two-part test: the defendant must prove that the information was inaccurate and show actual reliance on that information. *State v. Tiepelman,* 2006 WI 66, ¶¶ 26–28, 291 Wis. 2d 179, 717 N.W.2d 1. Proving inaccurate information is a threshold question—you cannot show actual reliance on inaccurate information if the information is accurate. When the question relates to other improper factors like race and gender, only the second part of the test, actual reliance, is relevant.

[11] For an explanation of errors subject to harmless error analysis versus structural errors, *see Neder v. United States,* 527 U.S. 1, 8–10 (1999); *State v. Ford,* 2007 WI 138, ¶¶ 42–43, 306 Wis. 2d 1, 742 N.W.2d 61; *State v. Harvey,* 2002 WI 93, ¶¶ 35–39, 254 Wis. 2d 442, 647 N.W.2d 189.

based on inaccurate information).[12] Requiring defendants who challenge their sentence to prove their case by clear and convincing evidence "promotes the policy of finality of judgments and satisfies the purpose of sentence modification, which is the correction of unjust sentences." *Id.* at 132.

¶ 35. Harris must therefore provide evidence indicating that it is "highly probable or reasonably certain" that the circuit court actually relied on race or gender when imposing its sentence. *Black's Law Dictionary* 577 (7th ed. 1999) (defining "clear and convincing evidence").

## B. The Reasonable Observer Test Is Not Appropriate

¶ 36. The court of appeals did not follow these established legal principles. Though giving lip service to its limited role of reviewing only for the erroneous exercise of discretion (*see Harris,* No. 2008AP810–CR, unpublished slip op., ¶¶ 1, 6–7), it created a new test, largely relying on two non-Wisconsin cases. The court of appeals concluded as follows:

---

[12] This court later withdrew language from *Littrup* concerning whether defendants had to show "prejudicial reliance" as opposed to "actual reliance" on inaccurate information. *Tiepelman,* 291 Wis. 2d 179, ¶ 31. We did not overrule *Littrup,* and our withdrawal of language did not affect the *Littrup* court's conclusion as to the proper burden of proof. *Id.* ("[A] defendant must establish that . . . the circuit court actually relied on the inaccurate information. Here, the court of appeals applied the wrong test—prejudicial reliance—when it affirmed the circuit court. We must, therefore, reverse that affirmance, and withdraw any language [in several cases, including *Littrup*] to the contrary."). Only when a case is overruled does it lose all of its precedential value. *See Blum v. 1st Auto & Cas. Ins. Co.,* 2010 WI 78, ¶ 56, ___ Wis. 2d ___, 786 N.W.2d 78.

Harris is entitled to resentencing because although the trial court properly considered all appropriate relevant factors, it nonetheless erroneously exercised its discretion when it made comments at sentencing that suggested to a reasonable person in the position of the defendant or a reasonable observer that it was improperly considering the defendant's race in imposing sentence.

*Id.,* ¶ 1. This test is not the law in Wisconsin, nor should it be.

¶ 37. First, applying a reasonable observer test to sentencing challenges is not supported by Wisconsin case law. The court of appeals cited only one Wisconsin case, *State v. Fuerst,* 181 Wis. 2d 903, 512 N.W.2d 243 (Ct. App. 1994), in support of its new approach. *Fuerst* did not create a reasonable observer test for sentencing evaluation, nor does any other Wisconsin case.[13]

---

[13] Both Harris and the court of appeals rely largely on two non-Wisconsin cases that adopted some form of a reasonable observer test with regard to issues of race.

In *United States v. Leung,* the Second Circuit Court of Appeals ordered resentencing because, although it was confident that the sentencing judge did not harbor bias against the defendant because of her ethnic origin, a reasonable observer might have inferred that the defendant's ethnicity and alien status played a role in her sentence. 40 F.3d 577, 586–87 (2d Cir. 1994).

Similarly, in *Jackson v. State,* the Court of Appeals of Maryland held that the circuit court's comments gave rise to an inference that race was inappropriately considered at sentencing because a reasonable person might infer that the trial judge considered race. 772 A.2d 273, 281–82 (Md. 2001).

Other courts addressing a claim that race or national origin affected sentencing did not resort to a reasonable observer analysis. *See, e.g., McCleskey v. Kemp,* 481 U.S. 279, 292–93 (1987) (holding that McCleskey's evidence of general bias in

703

¶ 38. In *Fuerst,* the defendant was convicted of first degree sexual assault of a child and sentenced to six years in prison. *Id.* at 908. The defendant asserted that the circuit court erroneously exercised its sentencing discretion because it improperly considered the defendant's lack of religious convictions and church attendance.[14] *Id.* Importantly, no one questioned whether the circuit court in fact had considered these factors; the record made clear that it had. The circuit court explicitly stated, both during the hearing and in its denial of the defendant's postconviction motion, that it believed the defendant's lack of church attendance and lack of religious convictions were relevant factors on which the court was relying.[15] *Id.* at 909. Thus,

---

capital sentencing was insufficient; "McCleskey must prove that the decisionmakers in his case acted with discriminatory purpose.") (emphasis removed); *United States v. Borrero-Isaza,* 887 F.2d 1349, 1355 (9th Cir. 1989) (concluding that the court sentenced the defendant because of his national origin, employing an actual reliance and not a reasonable observer analysis); *Ervin v. State,* 683 N.E.2d 641, 643 (Ind. Ct. App. 1997) (concluding that the defendant had failed to prove the trial court's words reflected racial prejudice and entitled him to a new sentence); *State v. Houk,* 906 P.2d 907, 909 (Utah Ct. App. 1995) (holding that the judge's comments did not prove defendant was sentenced more harshly because of his race).

[14] The defendant also claimed that the circuit court improperly considered his refusal to confess his guilt. *State v. Fuerst,* 181 Wis. 2d 903, 908, 512 N.W.2d 243 (Ct. App. 1994). The court of appeals found that the circuit court considered the defendant's refusal to admit his guilt as an indication of his lack of remorse, and that this was permissible. *Id.* at 916.

[15] During the sentencing hearing, the circuit court stated:

[Mr. Fuerst, you] have very little religious conviction []. I say that because you don't go to church. . . . I guess I make the distinction between somebody who goes to church every Sunday and some-

704

unlike the case at bar, the question in *Fuerst* was not whether the court *actually relied* on religion when imposing its sentence, but whether religious belief and church attendance *constituted impermissible factors* on which to base a sentence.

¶ 39. The court of appeals correctly stated that its review was for erroneous exercise of discretion, and that the defendant had the burden of showing that the sentence was imposed on unjustifiable bases, i.e., irrelevant or improper considerations. *Id.* at 909–10. Consistent with this, the court held that consideration of a defendant's religious beliefs and practices is only permissible if a "nexus exists between the defendant's criminal conduct and the defendant's religious beliefs and practices." *Id.* at 913.

¶ 40. Nothing in *Fuerst* adopts, supports, or even hints at a reasonable observer test.[16] The court of appeals in *Fuerst* concluded that because our state and federal constitutions render religious conviction and church attendance improper grounds upon which to enhance (or lessen) a sentence, the circuit court erro-

---

body who either doesn't go to church or believe in religion, and certainly those are mitigating factors.

In denying postconviction relief, the court reaffirmed its belief that religion was an important and relevant sentencing factor. *Id.* at 909.

[16] To be fair, the court of appeals stated that it found only "guidance" in *Fuerst,* and described the basic facts and holding of the case. *See Harris,* No. 2008AP810–CR, unpublished slip op., ¶ 17. The court of appeals did not explain how *Fuerst* supported its approach.

In his brief, Harris does not make any claim that *Fuerst* supports the reasonable observer test. Harris correctly cites *Fuerst* only for the proposition that a sentence based on irrelevant or improper considerations is subject to reversal as an erroneous exercise of discretion.

neously exercised its discretion by relying on such factors. The court remanded the matter so a sentence could be imposed "based upon consideration of *proper factors.*" *Id.* at 916 (emphasis added).

¶ 41. Neither the court of appeals nor Harris cite any Wisconsin case that purports to establish a reasonable observer test in reviewing sentencing decisions. This is because that is not the law in Wisconsin. To determine whether the circuit court imposed its sentence on the basis of race or gender, the established law in Wisconsin is that regardless of the nature of the improper factor, the defendant bears the burden of proving by clear and convincing evidence that the circuit court actually relied on that improper factor.

¶ 42. An additional reason we reject a reasonable observer test is that it contradicts established law on the burden of proof. Simply because a reasonable person or reasonable defendant might perceive that a circuit court actually relied on an improper factor does not make it so. Instead of requiring the defendant to prove actual reliance, the reasonable observer test requires only proof that a reasonable observer might perceive actual reliance. These are not the same thing. In effect, the reasonable observer test significantly lowers the burden of proof, and upends our strong public policy of leaving sentencing to the circuit court and reviewing sentencing decisions only for erroneous exercise of discretion.

¶ 43. Finally, the reasonable observer test articulated by Harris and the court of appeals lacks basic clarity and is unworkable in practice. First, it is not clear if the reasonable observer test is meant to apply to all improper factors, or only certain factors like race, and maybe gender. Additionally, it is unclear how widely shared this perception needs to be to pass this test. Must a sentence be thrown out if even one intelligent

706

person listening to the sentencing hearing might think a judge relied on race? In short, this test lacks the clarity and workability necessary to be a sound rule of law. *See Horst v. Deere & Co.,* 2009 WI 75, ¶ 71, 319 Wis. 2d 147, 769 N.W.2d 536 ("One of the basic requirements of a coherent legal test is that it offer a framework for analyzing claims that provides some measure of predictability.").

¶ 44. In short, the reasonable observer test articulated by the court of appeals and endorsed by Harris (1) is not supported by Wisconsin case law; (2) contradicts and guts established law by lowering the defendant's burden of proof; and (3) lacks basic clarity and workability.

## C. Application to Harris

¶ 45. As explained above, Harris has the burden to prove by clear and convincing evidence that the circuit court actually relied on race or gender in imposing its sentence. Our obligation is to review the sentencing transcript as a whole, and to review potentially inappropriate comments in context.

¶ 46. Harris and the court of appeals point to the phrase "baby mama" and the references to "you guys" and "these women" by the circuit court as evidence that Harris's sentence was based on race. In order to substantiate his claim that the circuit court relied on gender, Harris points to the circuit court's criticism of his alleged child care arrangement with the child's mother. We address each of these in turn.

### 1. Racial Stereotyping

¶ 47. Harris alleges that the references to "you guys" and "these women" are very similar to the more

clearly offensive "you people," and that in combination with the sarcastic use of "baby mama," these comments suggest that the circuit court relied on race.

¶ 48. The court initially used the phrases "you guys" and "these women" during a conversation with Harris regarding the child's mother. Upon finding out that the child's mother works, completed high school, and was attending college, the following exchange occurred:

> The Court: Where do you guys find these women, really, seriously. I'd say about every fourth man who comes in here unemployed, no education, is with a woman who is working full-time, going to school. Where do you find these women? Is there a club?
>
> The Defendant: No.
>
> The Court: You're sure?
>
> The Defendant: I ain't find her at—she not the club [type].
>
> The Court: Oh, she's not the club type.

¶ 49. During its explanation of the sentence and reproof of Harris, the circuit court similarly stated, "I swear there's a club where these women get together and congregate."

¶ 50. The circuit court used the term "baby mama" twice during the sentencing hearing.[17] Both occurrences were during the circuit court's discussion of the proper factors and the explanation of its reasons for the sentence.

¶ 51. The first occurrence was during the court's discussion of the dangers of drugs internationally; this led the court to contrast individuals Harris's age who

---

[17] The court also used the term "baby's mama" once earlier in the hearing.

were in the armed forces and "putting their lives at stake," with Harris, who "sits at home, gets high while his baby mama works and goes to school."

¶ 52. The second occurrence was during the court's discussion of Harris's listless efforts to obtain gainful employment during the seven months since his arrest. The court admonished Harris for choosing the easy route of getting high rather than working hard and obtaining a job that would provide money and benefits for his daughter. It then stated, "I'm sure your wife already is providing that—not your wife, your baby mama is already providing that."

¶ 53. In the context of the court's comments, the phrases "you guys" and "these women" clearly have no racial connotations. The court stated exactly what it meant immediately following their usage by referring to the frequency with which the court sees unemployed and uneducated fathers come into court with mothers working full-time and going to school. The court was observing a common scenario, a reality the circuit court found maddening, and not without reason.

¶ 54. The parties dispute the racial connotations of the phrase "baby mama." Citing several popular sources, including urbandictionary.com and an article on the subject on salon.com, Harris maintains that the phrase evokes a racial stereotype. The State maintains that "baby mama" has been popularized in American culture and does not necessarily have racial connotations. The State also disputes the reliability of the sources cited by Harris, and notes that none of the definitions on urbandictionary.com and wikipedia.com define the term with reference to race.

¶ 55. At best, this term reflects popular slang, referring to a mother who is not married to and may or may not have a continuing relationship with the father

709

of the child or children. Even Harris acknowledges this phrase is sometimes used with reference to non-African Americans. It also appears that both parties agree the phrase, at a minimum, can be offensive depending on the context of its use.

¶ 56. Looking at the hearing transcript as a whole, we do not believe that the circuit court's use of the phrase "baby mama" makes it highly probable or reasonably certain that the circuit court actually relied on race when imposing its sentence.

¶ 57. We would be more inclined to conclude that the circuit court intended racial disparagement if other parts of the sentencing hearing so reflected. They do not. Beyond the references to "you guys" and "these women," which in our view do not have a racial component as used by the circuit court, Harris cites nothing else in the entire 32–page sentencing transcript that suggests his sentence was based on race. In fact, nothing in the transcript mentions Harris's race at all.

¶ 58. Additionally, both uses of the phrase "baby mama" accord with the general popular understanding of the mother of a child who is not married to and may or may not have a continuing relationship with the father. The court's first use of the phrase compared Harris's choices to those of men his age serving in the military overseas and to those of the mother of Harris's child. The second occurrence came in the context of Harris's lack of effort at securing gainful employment to support his daughter, even though jobs were available. The presentence investigation report in this case also indicates that Harris was not married to the mother of his child, and was in fact dating another woman.

¶ 59. The court clearly found that Harris was acting irresponsibly, and appears to have used this

710

phrase to chide Harris for his poor choices. These observations bear a reasonable nexus to relevant factors, including Harris's character, education, employment, and need for close rehabilitative control. The court's comments bear on relevant factors and do not, in context or as a whole, implicate race.

¶ 60. In sum, Harris has not met his burden of proving by clear and convincing evidence that the circuit court actually relied on race when it imposed its sentence.

## 2. Gender Stereotyping

¶ 61. To support his claim that the circuit court imposed its sentence on the basis of gender, Harris points to the court's criticism of the fact that Harris stayed at home while his child's mother worked. Harris maintains that having the father stay at home is a perfectly acceptable child-care arrangement, and the court's statements make clear that it used this fact as an aggravating factor.

¶ 62. If it were clear that Harris's decision to stay home was the result of a mutually agreed-upon child-care arrangement with the child's mother, and that Harris was doing this as a responsible father, Harris's argument would have some merit. But that is not what the record reveals.

¶ 63. The record reveals that Harris used the money from dealing drugs to support his daughter, and that following his arrest, he made no efforts to replace that revenue stream. There is also no evidence that Harris was his daughter's stay-at-home primary caretaker. The court concluded that Harris was not being a responsible father, not making any efforts to provide for

his daughter, and was instead spending his time smoking pot and hanging out with known gang members, even when not dealing drugs. The court gave Harris ample opportunity to clarify and demonstrate responsible behavior, but the court did not find it. Harris's character, the court concluded, was "completely unimpressive."

¶ 64. Regarding reliance on gender, then, Harris has not met his burden of proving by clear and convincing evidence that the circuit court actually relied on gender as a factor in imposing its sentence.

### 3. The Circuit Court Did Not Erroneously Exercise Its Discretion

¶ 65. As explained above, Harris has not met his burden of showing that the circuit court actually relied on race, gender, or other improper factors during sentencing. Reviewing the sentencing transcript in context and as a whole, we conclude that the circuit court considered the proper factors; it evaluated the gravity of the offense, Harris's character, and the public's need for protection. The circuit court carefully explained why it imposed the sentence it did. We find nothing to suggest that the circuit court's sentence was an erroneous exercise of discretion.

### IV. CONCLUSION

¶ 66. In summary, we reject the reasonable observer test created by the court of appeals. Sentencing decisions are afforded a presumption of reasonability consistent with Wisconsin's strong public policy against interference with a circuit court's discretion. Our review of sentencing decisions is therefore limited to

determining if the circuit court erroneously exercised its discretion. Discretion is erroneously exercised when a sentencing court actually relies on clearly irrelevant or improper factors, and the defendant bears the burden of proving such reliance by clear and convincing evidence. It is beyond dispute that race and gender are improper factors; they may not be relied upon—at all—in the imposition of a sentence.

¶ 67. After reviewing the sentencing transcript in context and as a whole, we conclude that Harris has not met his burden of proving by clear and convincing evidence that the circuit court actually relied on race or gender. The circuit court considered the proper factors—it evaluated the gravity of the offense, Harris's character, and the public's need for protection. The circuit court thoroughly explained its reasons for the sentence it imposed, and all of the potentially offensive comments flagged by both Harris and the court of appeals bear a reasonable nexus to proper sentencing factors. Because Harris has not shown that the circuit court erroneously exercised its discretion, we reverse the decision of the court of appeals.

*By the Court.*-The decision of the court of appeals is reversed.

¶ 68. ANN WALSH BRADLEY, J. *(concurring)*. This case squarely presents the question of how to identify and address the appearance of racial and gender stereotyping in the context of criminal sentencing. On the first page of its brief to this court, the State queried: "[The court of appeals concluded] that some of a sentencing judge's comments could be perceived as suggesting that the sentencing judge imposed the sentence at least in part because of race. Is that a basis for vacating the sentence?"

¶ 69. Since we accepted this case for review, this court has been faced with questions related to the appearance of bias in two other contexts, motions for recusal[1] and amendments to the code of judicial ethics.[2] Both of these questions have been difficult for the court.

¶ 70. We accepted Harris's petition for review to resolve how courts should address questions related to an appearance of bias. Yet, that issue does not appear in the majority opinion. Aside from two footnotes dismissing this concurrence, the word "appearance" appears nowhere in the majority's discussion.

¶ 71. All seven members of this court agree that a defendant has a constitutional due process right not to be sentenced on the basis of race or gender. Majority op., ¶ 33. We all agree that stereotypes constitute improper sentencing factors, and if a circuit court considers them when imposing sentence, it has erroneously exercised its discretion. *Id.*

¶ 72. The question, then, is how a reviewing court should determine whether the circuit court considered racial or gender stereotypes when imposing sentence.

---

[1] *See e.g., State v. Allen,* 2007AP795, (requesting recusal on grounds of "actual bias in favor of the prosecution . . . and the impermissible appearance of bias") (filed April 17, 2009), interim order published at 2010 WI 10, 322 Wis. 2d 372, 778 N.W.2d 863 (Feb. 11, 2010).

[2] Nos. 08–16, 08–25, 09–10, 09–11, *In the Matter of Amendment of the Code of Judicial Conduct's Rules on Recusal,* order filed July 7, 2010 (available at http://wicourts.gov/supreme/sc_hearing_rules.jsp); *see also* Wisconsin Supreme Court, Open Administrative Hearing on Rules Petitions 08–16, 08–25, 09–10, and 09–11, relating to amendments to the Code of Judicial Conduct's rules on recusal and campaign contributions, October 28, 2009 (available at http://www.wiseye.org/wisEye_ programming/wisEye_VideoArchive_09.html).

714

The majority analogizes a sentence based on a stereotype to a sentence based on inaccurate information. *Id.*, ¶ 32. It explains that a defendant "has the burden to prove that the circuit court actually relied on race or gender in imposing its sentence." *Id.*, ¶ 33.

¶ 73. The majority's analogy to inaccurate information is inapt and fails to recognize the whole picture. Unlike inaccurate information, which will often be readily ascertainable from the face of a sentencing transcript, a sentencing decision based on a stereotype will be more difficult to identify. The problem is that it is impossible to determine what a judge was "actually" thinking. A reviewing court cannot look into a sentencing judge's mind:

> Bias or prejudice is such an elusive condition of the mind that it is most difficult, if not impossible, to always recognize its existence, and it might exist in the mind of one . . . who was quite positive that he had no bias, and said that he was perfectly able to decide the question wholly uninfluenced by anything but the evidence.

*Crawford v. United States*, 212 U.S. 183, 196 (1909).

¶ 74. The majority recognizes that proving that the sentencing court actually "relied on race and gender may in some instances be a bit of an amorphous task." Majority op., ¶ 34. Yet, it offers no solution.

¶ 75. The United States Supreme Court recently explained that "[t]he difficulties of inquiring into actual bias . . . simply underscore the need for objective rules." *Caperton v. A.T. Massey Coal Co., Inc.,* 129 S. Ct. 2252, 2263 (2009). Appearance of bias is an "objective standard[] that do[es] not require proof of actual bias." *Id.* By focusing on actual bias and ignoring the apparent, the majority is looking at only half of the equation.

715

¶ 76. The appearance of bias in sentencing is an issue at the essence of this case. Below is the analysis of the issue that should have appeared in a majority opinion.

I

¶ 77. I begin by examining the court of appeals decision. It provides the touchstone for our review.

¶ 78. In a split decision, the court of appeals concluded that "the trial court properly considered all appropriate [and] relevant factors." *State v. Harris*, No. 2008AP810–CR, unpublished slip op., ¶ 1 (Wis. Ct. App. Jan. 21, 2010). The court of appeals determined that the circuit court "nonetheless erroneously exercised its discretion when it made comments at sentencing that suggested to a reasonable person in the position of the defendant or a reasonable observer that it was improperly considering the defendant's race in imposing sentence." *Id.*, ¶ 6.

¶ 79. The court of appeals did not conclude that the circuit court "intended these comments to be offensive, or that it intentionally engaged in racial stereotyping." *Id.*, ¶ 13. Nevertheless, it was concerned that the comments could have created "the reasonable perception . . . that the sentence was being imposed at least in part because of race." *Id.*

¶ 80. Acknowledging that "the appearance of justice is important," it determined that "resentencing was required to satisfy the appearance of justice" even though "it could not be determined that the trial court actually improperly relied on race as a sentencing factor." *Id.*, ¶ 18. Because the court of appeals concluded that race was dispositive, it declined to address whether the circuit court's comments concerning "the

716

traditional roles of men and women would also justify resentencing." *Id.*, ¶ 10 n.4.

¶ 81. The State contends that the court of appeals erred by vacating Harris's sentence based on how the sentencing court's comments could be perceived. Further, it contends that the comments made by the circuit court at sentencing, when read in context, did not demonstrate an erroneous exercise of discretion.

¶ 82. In contrast, Harris argues that the court of appeals correctly applied the law. He asserts that it is well established that a circuit court erroneously exercises its discretion when it imposes a sentence based on irrelevant or improper considerations such as gender and racial stereotypes. Harris asserts that the language chosen by the court would lead a reasonable person to conclude that the court was impermissibly stereotyping Harris and the mother of his child.

## II

¶ 83. To determine whether the court of appeals correctly concluded that the sentencing court erroneously exercised its discretion, it is instructive to examine Wisconsin cases as well as cases from other jurisdictions. I first discuss impermissible sentencing considerations that constitute an erroneous exercise of discretion, including racial and gender stereotypes. Then, I apply these principles of law to the sentencing transcript at hand.

¶ 84. Although appellate courts follow a consistent and strong policy against interference with the discretion of the circuit court in passing sentence, the circuit court's exercise of discretion is not unfettered. *State v. Schreiber,* 2002 WI App 75, ¶ 9, 251 Wis. 2d 690, 642 N.W.2d 621. When the court imposes its

sentence based on irrelevant or improper factors, the circuit court has erroneously exercised its discretion. *Id.*; *State v. Gallion,* 2004 WI 42, ¶ 17, 270 Wis. 2d 535, 678 N.W.2d 197. In such a case, the defendant "has the burden of showing that the sentence was based on clearly irrelevant or improper factors." *Id.,* ¶ 72.

¶ 85. A sentencing court's explicit reliance on an irrelevant or improper factor constitutes an erroneous exercise of discretion. For example, in *State v. Fuerst,* 181 Wis. 2d 903, 512 N.W.2d 243 (Ct. App. 1994), the circuit court cited Fuerst's lack of regular church attendance as a factor leading to its conclusion that probation was inappropriate. *Id.* at 909, 914. Responding to Fuerst's postconviction motion, the circuit court reaffirmed its belief that religion is an important consideration at sentencing. *Id.* at 915

¶ 86. On review, the court of appeals determined that the circuit court's "weighing for sentencing purposes Fuerst's belief[] system and history of not attending church" constituted an erroneous exercise of discretion. *Id.* at 908. It concluded that because there was no identifiable nexus between his lack of religious conviction and his crime, the circuit court's consideration of religion violated Fuerst's right to religious freedom under the federal and state constitutions. *Id.* at 912.

¶ 87. Likewise, a court's sentence which explicitly relied upon racial or gender stereotypes would be impermissible. "A defendant's race or nationality may play no adverse role in the administration of justice, including at sentencing." *United States v. Leung,* 40 F.3d 577, 586 (2d Cir. 1994).[3] Similarly, gender should play no

---

[3] *See also Martinez v. State,* 961 P.2d 143, 145 (Nev. 1998) ("A trial judge may not . . . consider a defendant's nationality or ethnicity in its sentence determination.").

adverse role in the administration of justice. *See, e.g., J.E.B. v. Alabama*, 511 U.S. 127 (1994).

¶ 88. Under certain circumstances, due process may be violated even when a court does not explicitly rely on an improper factor. This is because it is an impossible task for a reviewing court to see into a judge's mind:

> Bias or prejudice is such an elusive condition of the mind that it is most difficult, if not impossible, to always recognize its existence, and it might exist in the mind of one . . . who was quite positive that he had no bias, and said that he was perfectly able to decide the question wholly uninfluenced by anything but the evidence.

*Crawford*, 212 U.S. at 196. Therefore, courts have determined that when apparent bias reveals a great risk of actual bias, due process is violated.

¶ 89. In *State v. Gudgeon*, the court of appeals grappled with the proper application of an appearance of bias standard. 2006 WI App 143, ¶¶ 24–26, 295 Wis. 2d 189, 720 N.W.2d 114. The court stated: "Initially, we had a difficult time discerning from [numerous state and federal cases] whether actual bias was necessary or merely sufficient" to establish a due process violation. 295 Wis. 2d 189, ¶ 22. "Several cases indicated that . . . apparent bias did not suffice to establish a due process violation. . . . Other precedents stated the contrary." *Id.* Even though the law appeared to be contradictory "on its face," the court ultimately concluded that "this divergent case law can be harmonized." *Id.*, ¶¶ 22–23.

¶ 90. The court concluded that the appearance of bias was sufficient to establish a due process violation "only where the apparent bias revealed a great risk of

actual bias." *Id.*, ¶ 23. It determined that "the appearance of bias offends constitutional due process principles whenever a reasonable person—taking into consideration human psychological tendencies and weaknesses—concludes that the average judge could not be trusted to 'hold the balance nice, clear and true' under all the circumstances." *Id.*, ¶ 24

¶ 91. *Gudgeon*'s conclusion is consistent with the jurisprudence of the United States Supreme Court. The *In re Murchison* Court explained that due process "requires an absence of actual bias in the trial of cases." 349 U.S. 133, 136 (1955). Furthermore, "even the probability" of actual bias must be avoided because "justice must satisfy the appearance of justice." *Id.*

¶ 92. Similarly, in *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813, 825 (1986), the Court made clear that it was "not required to decide whether in fact" there was actual bias to find a due process violation. The *Withrow v. Larkin* Court explained that the guarantee of due process is violated when, "under a realistic appraisal of psychological tendencies and human weakness," there exists "such a risk of actual bias or prejudgment." 421 U.S. 35, 47 (1975).

¶ 93. Although courts have stated the standard in various ways throughout the years, I use the formulation discussed in *Gudgeon,* 295 Wis. 2d 189, ¶ 23, and *State v. Goodson,* 2009 WI App 108, ¶ 14, 320 Wis. 2d 166, 771 N.W.2d 385. Due process is violated when there exists actual bias or a great risk of actual bias.

¶ 94. Wisconsin courts have previously addressed the appearance of actual bias in the sentencing context. In *Goodson,* the court of appeals determined that the sentencing judge's earlier promise to sentence the defendant to the maximum penalty created the appearance of bias, requiring resentencing. *Id.*, ¶ 13. Al-

720

though the State argued that the circuit court properly based its decision on applicable sentencing factors, *Id.,* ¶ 15, the court of appeals concluded that there was a great risk that the sentence was based on an improper factor—a promise.

¶ 95. Although *Goodson* addresses the appearance of actual bias in another sentencing context, Wisconsin courts have never specifically addressed the appearance of a sentence based on racial or gender stereotypes. Therefore, I seek guidance in the jurisprudence of other jurisdictions.

¶ 96. The Second Circuit reviewed a district court's sentence of a woman of Chinese descent. There, the sentencing court cited deterrence of "others in the Asiatic community" as an objective for the sentence imposed. *Leung,* 40 F.3d at 585. Among other comments, the sentencing court elaborated: "We have enough home-grown criminals in the United States without importing them." *Id.*

¶ 97. On review, the appellate court stated that it was "confident that the able and experienced trial judge in fact harbored no bias against [the defendant] because of her ethnic origin, her alien status, or any other categorical factor." *Id.* at 586. Nevertheless, the court concluded that "there is a sufficient risk that a reasonable observer, hearing or reading the quoted remarks, might infer . . . that [the defendant's] ethnicity and alien status played a role in determining her sentence." *Id.* at 586–87. Because "justice must satisfy the appearance of justice," the court vacated the sentence and remanded for resentencing. *Id.*

¶ 98. Similarly, the Supreme Court of Maryland examined a case in which the sentencing court's comments "call[ed] the fairness of the sentence into question." *Jackson v. State,* 772 A.2d 273, 281 (Md. 2001).

The judge appeared to operate under the belief that the African-American defendant came from "the city" and lived like he was "from a ghetto." The court stated:

> Now, unfortunately, a number of communities in the lovely city of Columbia have attracted a large number of rotten apples. Unfortunately, most of them came from the city. And they live and act like they're living in a ghetto somewhere. And they weren't invited out here to behave like animals. . . . [G]oing out of the way to go to somebody else's house and confront people with sawed-off shotguns is what they do in the city. That's why people moved out here. To get away from people like [the defendant]. Not to associate with them and have them follow them out here and act like this was a jungle of some kind. So. It's not. And our only chance to preserve it is to protect it.

*Id.* at 275–76.

¶ 99. On appeal, the Maryland Court of Appeals could not "determine whether the sentencing judge was motivated by ill-will or prejudice based upon his belief that [the defendant] was 'from the city' or because he was an African-American, or both, or neither." *Id.* at 281. "At best," the court stated, the comments "give the appearance of bias towards persons who are raised in an urban environment." *Id.* at 282. "[A]t worst, the comments demonstrate[d] actual prejudice in the sentencing process towards residents of cities or, even still worse, towards persons based upon their racial background." *Id.* The court determined that because "our system of law has always endeavored to prevent even the *probability* of unfairness," due process had been violated. *Id.* at 281. It remanded for resentencing. *Id.* at 282.

¶ 100. Although the facts of the above cases can be distinguished from the facts presented here, the

underlying legal principles hold true. Comments related to race (or gender) made at sentencing may "exceed[] the outer limit of a judge's broad discretion in sentencing and therefore amount[] to the application of impermissible sentencing criteria." *Id.* A sentencing court has erroneously exercised its discretion when the defendant demonstrates that the court actually relied, or there is a great risk that the court actually relied, on an improper factor, racial or gender stereotypes, when imposing sentence.

¶ 101. This does not mean that a sentencing record must be devoid of any reference to race or gender. Such reference, however, cannot be based on stereotypes. It must be individualized to the defendant and his criminal conduct, and it must bear a reasonable nexus to the recognized sentencing factors and objectives. If the reference is not individualized or there is no nexus, then the reference to race or gender is irrelevant and the court may not adversely rely upon it when imposing sentence. *See Fuerst,* 181 Wis. 2d at 913. When the court imposes its sentence based on irrelevant or improper factors, the circuit court has erroneously exercised its discretion. *Gallion,* 270 Wis. 2d 535, ¶ 17.

### III

¶ 102. I now examine Harris's sentencing transcript to determine whether the court erroneously exercised its discretion by adversely considering or appearing to consider improper or irrelevant factors when imposing sentence. Harris asserts that the court's comments and rhetorical questions at sentencing conveyed both sexism and racism. He argues that the court impermissibly considered gender because it treated as an aggravating factor the "division of labor" between

Harris and the mother of his child. Further, he highlights the court's sarcastic use of what he portrays as "code words" evincing racism: "baby mama," "you guys," and "these women."

¶ 103. The sentencing transcript does not establish that the court impermissibly considered gender by relying on an untraditional division of labor as an aggravating factor when imposing sentence. The record does not reflect that Harris and the mother of his child had any agreement regarding a division of labor. Although the court inquired about whether "watch[ing] the child" was Harris's primary responsibility, it was in the context of ascertaining information about his employment history and efforts toward supporting his family:

> The court: So the mother works and you sit at home, right?
>
> The defendant: Yeah.
>
> The court: And watch the child?
>
> The defendant: I got all types of things goin'. My personal family.

¶ 104. Upon arrest and again at sentencing, Harris stated that the reason he sold drugs was to support his daughter. He told the court that he did not plan to "make a career" out of drug trafficking. Nevertheless, there was no evidence that Harris had made any effort to replace the income that he formerly made by selling drugs. The record reflected that Harris had not made any attempt to look for a job in the seven months since he had been arrested. Further, he had abandoned his attempt to get a GED, which could have improved his chances of securing legitimate employment.

¶ 105. At sentencing, the court is required to take a defendant's character and rehabilitative needs into account. Here, the record reflects that the court searched for evidence that Harris was seeking a legitimate way to support himself and his child, but it found none:

> [W]e have seven months here where this young man had the opportunity to go and get his GED, stop smoking marijuana and start working. We had seven months. He had seven months and he's done none of those things.

Harris acknowledged that he had financial "responsibilities" to support his daughter, but he had taken no initiative to fulfill them.

¶ 106. The court concluded that "[h]e's in the business" of dealing drugs and that "[h]e's shown no inclination to make any changes." It stated that drug dealing is "a very dangerous profession" and "if Mr. Harris is killed, his daughter never has a daddy." Based on this record, I cannot conclude that Harris has demonstrated that the court actually sentenced him, or there is a great risk that the court actually sentenced him, based on a bias—that is, stereotypes about the traditional roles of men and women. Further, the court's comments bear a reasonable nexus to recognized sentencing factors and objectives.

¶ 107. I turn next to Harris's contention that the circuit court's use of language evinces racial bias. Harris takes issue with the following statement, coupled with the court's use of the term "baby mama":

> Where do you guys find these women, really, seriously. I'd say about every fourth man who comes in here unemployed, no education, is with a woman who is

working full-time, going to school. Where do you find these women? Is there a club?[4]

This comment evinces the circuit court's frustration about the number of defendants it sees, like Harris, who have abandoned their responsibilities to their families.

¶ 108. In isolation, a comment equating Harris and other defendants could create the perception that Harris was not sentenced based on his own individual characteristics, but based on the court's frustration with criminal defendants generally. In context, however, it is apparent that the circuit court was focusing not on criminal defendants or drug dealers generally, but on Harris's individual characteristics.

¶ 109. The court compared the hard-working character of the mother of Harris's child with the character of Harris himself. Harris's child's mother was gainfully employed, pursuing an education, and providing health care for the child. By contrast, the court had just determined that despite Harris's admitted support "responsibilities," Harris had taken no initiative towards fulfilling them in the seven months since his arrest.

¶ 110. The record reflects that the facts and inferences relied upon by the court—that Harris had abdicated his responsibilities to his daughter and made no attempt to "make any changes"—were reasonably derived from the record. Understood in context, there is a reasonable nexus between the court's comments and Harris's character and rehabilitative needs.

¶ 111. Harris also contends that the term "baby mama" was "racially offensive." The parties dispute

---

[4] The court later added: "I swear there's a club where these women get together and congregate."

whether the term "baby mama" has a racial connotation, but both agree that the term has recently emerged in popular culture. As the Seventh Circuit has explained, "[t]he use of slang in discharging the awesome duty of sentencing is regrettable." *United States v. Schneider,* 910 F.2d 1569, 1571 (7th Cir. 1990). In addition to diminishing the proper decorum of the courtroom, *see Id.,* the use of slang should be guarded against because it may be subject to unintended interpretations.

¶ 112. I conclude that there has been no showing of actual bias or the great risk of actual bias. Generally, "baby mama" is a slang term referring to the unmarried mother of a man's child, and the court was considering Harris's relationship with a woman who fit that definition.[5] Thus, based on the above, I conclude that Harris has failed to meet his burden to demonstrate that the sentencing court actually considered or appeared to consider an improper factor, racial stereotypes, when imposing the sentence.

¶ 113. Additionally, the cases discussed above that vacated a sentence because of the appearance of bias can be distinguished from the facts presented here. In Jackson, there was no nexus between the recognized sentencing factors and "rotten apples" who "came from the city" and "live and act like they're living in a ghetto" or a "jungle of some kind." Similarly, in *Leung,* there was no nexus between the defendant's individual characteristics and conduct and the sentencing judge's desire to "send a message to the Asiatic community." By contrast, when the court's comments in this case are

---

[5] The PSI reveals that Harris formerly dated the mother of his daughter for two years. At the time of sentencing, Harris was dating another woman.

read in context, there is a nexus between the comments and Harris's criminal conduct, character, and rehabilitative needs.

¶ 114. Harris was convicted of a Class E felony offense with a maximum imprisonment term of 15 years and a maximum initial confinement term of 10 years. Here, the court gave reasons for rejecting probation and the FDOAP program. It determined that the gravity of the offense and the needs of the defendant required a period of initial confinement and imposed a two-year period of initial confinement.

¶ 115. Based on a review of the transcript of Harris's sentencing, I determine that Harris has not met his burden to demonstrate that the circuit court erroneously exercised its discretion by actually considering or appearing to consider an improper factor, race or gender stereotypes, when imposing the sentence. The sentencing transcript reflects that the sentence was individualized to Harris and his criminal conduct, and there was a reasonable nexus between the court's comments and the recognized sentencing factors and objectives. Accordingly, I respectfully concur.

¶ 116. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON and Justice N. PATRICK CROOKS join this concurrence.