KESSLER, P.J.
¶1 Kenneth Alexander Burks appeals the judgment of conviction, following a jury trial, of one count of first-degree reckless homicide and one count of possession with intent to deliver a controlled substance (three grams or less of heroin). He also appeals the order denying his postconviction motion for relief. We affirm.
BACKGROUND
¶2 On April 27, 2016, an amended complaint charged Burks with one count of first-degree reckless homicide, under the Len Bias law, as a party to a crime, and one count of possession with intent to deliver a controlled substance (three grams or less of heroin).[1] According to the complaint, on February 7, 2016, West Allis police responded to a report of a deceased person at a West Allis home. Police found the body of Nicholas Karboski. The medical examiner's report stated that Karboski died from "Acute Mixed Drug Toxicity" resulting from a combination of heroin, fentanyl, and diphenhydramine.
¶3 The complaint also states that Detective Todd Kurtz, one of the officers dispatched to Karboski's home on February 7, 2016, found an iPhone in Karboski's pants pocket. The phone contained messages between Karboski and another person, in which the other person mentioned two potential sources from whom they could obtain heroin. Kurtz identified the other person from the text messages as E.G. E.G. cooperated with police and admitted to Kurtz that she and Karboski purchased heroin from Burks. Kurtz and E.G. set up a drug-buying operation that ultimately resulted in Burks's arrest.
Jury Trial
¶4 The matter proceeded to trial where both Kurtz and E.G. testified. Kurtz testified that on February 7, 2016, he went to Karboski's home to investigate his death. Kurtz stated that he immediately suspected Karboski died of an overdose because Kurtz found Karboski in bed, wearing street clothes, and with a needle in his hand. Kurtz also found Suboxone pill bottles, which Kurtz stated "heroin addicts use to try to get off heroin." Kurtz also found Karboski's cell phone, which contained messages between Karboski and E.G. from the early morning hours of February 7, 2016. Kurtz stated that he located E.G. and informed her of Karboski's death. E.G. voluntarily turned her phone over to Kurtz and gave him permission to search her phone.
¶5 Kurtz stated that E.G.'s phone showed text messages between E.G. and both her heroin supplier and Karboski from February 6 and February 7, 2016. The texts from Karboski asked E.G. whether E.G. had a heroin supplier willing to sell drugs that night. E.G. responded in the affirmative, stating she had two dealers and one of them had "good drugs." The messages further indicated that E.G. contacted a supplier, later identified as Burks, who confirmed that he had drugs available immediately. Kurtz stated that based on the text messages, Kurtz believed E.G. bought heroin from Burks twice on the night before Karboski's death. E.G. also admitted to Kurtz that she supplied Karboski with heroin.
¶6 Kurtz stated that when he spoke with E.G., E.G.'s version of events matched the text messages. Kurtz stated that E.G. was "very believable" and was willing to help police apprehend Burks. E.G. called Burks and asked if he had "the same stuff he had during that previous transaction, or that Saturday night buy." Burks responded that he had more "of that good shit."[2] E.G. arranged a buy at her workplace and Burks encouraged E.G. to buy a large amount so that she could begin selling too. Kurtz further stated that at the time of buy, Burks called E.G. to describe his car and to tell her where he was parked. Police moved in to arrest Burks.
¶7 Kurtz further stated that police collected evidence from Burks's car, which contained two cell phones, one of which Kurtz identified as a "dope phone." The "dope phone" contained several pictures of Burks, including pictures of Burks wearing a necklace and lanyards, which Kurtz said are typically worn by drug dealers. The call log of the phone showed the phone calls between E.G. and Burks.
¶8 E.G. also testified, telling the jury about her heroin addiction and attempts at rehabilitation. She identified Burks as her heroin dealer and told the jury that she helped Kurtz set up a buy with Burks to deliver heroin to her workplace. E.G. also admitted to providing heroin to Karboski on the night he died, saying that the heroin felt "a little stronger" than what she had previously used.
¶9 The jury found Burks guilty as charged.
Sentencing Hearing
¶10 At the sentencing hearing, the State told the sentencing court that the "good shit" Burks sold to E.G. was heroin mixed with the fentanyl, a potent drug that can cause an overdose with just a few micrograms. The State discussed the potency of fentanyl as well as a worsening heroin epidemic. The State also noted that Burks did not take responsibility for his role in Karboski's death.
¶11 The sentencing court called "Len Bias" cases the most "stressful" for the court because "[t]his is a situation where both parties involved had some blame as to what went on." The court discussed the history and principles of the Len Bias law as well as Karboski's struggle with addiction, but stated "Mr. Burks as well as many others in our community profit off this or profited off of this." The court discussed the opioid epidemic, the medical and pharmaceutical industries, and the battles that many drug addicts face.[3] The court also discussed the seriousness of Burks's offense, discussing the role Burks played in Karboski's death and noting that Burks knew "what was in the stuff [he] was selling." The court considered Burks's character, referencing his minimal record and his family. Finally, the court discussed the need to protect the public, stating, "there needs to be some significant punishment to make sure that that is conveyed to the people who want to be big time drug dealers, aspiring heroin dealers."
¶12 The court sentenced Burks to fifteen years of initial confinement and ten years of extended supervision on the first-degree reckless homicide charge and five years of initial confinement and five years of extended supervision on the intent to deliver charge.
Postconviction Motion
¶13 Burks filed a postconviction motion, arguing that his counsel was ineffective for failing to object to "the testimony of a Milwaukee police officer who testified that the statements of the State's star witness E.G. were 'very believable.' " Burks argued that Kurtz's testimony constituted "impermissible vouching." Burks also argued that counsel was ineffective for failing to object to the sentencing court's reliance on an impermissible sentencing factor. Burks argued that the court impermissibly sentenced Burks based upon its concerns of an opioid epidemic and its perception of the conduct of the medical and pharmaceutical industries, rather than upon the crimes actually committed. The postconviction court denied the motion without a hearing. This appeal follows.[4]
DISCUSSION
¶14 To substantiate a claim of ineffective assistance of trial counsel, a defendant must prove that counsel performed deficiently and that he or she was prejudiced by counsel's performance. Strickland v. Washington , 466 U.S. 668, 687 (1984). To prove deficient performance, a defendant must show specific acts or omissions of counsel that are "outside the wide range of professionally competent assistance." Id. at 690. To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693. The defendant's burden is to show that counsel's errors "actually had an adverse effect on the defense." Id.
¶15 "A motion claiming ineffective assistance of counsel does not automatically trigger a right to a [postconviction] testimonial hearing." State v. Phillips , 2009 WI App 179, ¶17, 322 Wis. 2d 576, 778 N.W.2d 157. The postconviction court may deny a defendant's motion arguing that he or she received ineffective assistance of appellate counsel without a hearing if the defendant fails to allege sufficient facts in his motion to show that he or she would be entitled to relief if those facts were established. See id.
I. Improper Vouching
¶16 "No witness, expert or otherwise, should be permitted to give an opinion that another mentally and physically competent witness is telling the truth." State v. Haseltine , 120 Wis. 2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984). Assessments of witness credibility are left to the jury's judgment. See State v. Romero , 147 Wis. 2d 264, 278, 432 N.W.2d 899 (1988). "The Haseltine rule is intended to prevent witnesses from interfering with the jury's role as the 'lie detector in the courtroom.' " State v. Snider , 2003 WI App 172, ¶27, 266 Wis. 2d 830, 668 N.W.2d 784 (bolding added; citation and one set of quotation marks omitted). Whether a witness has improperly vouched for the credibility of another witness is a question of law, reviewed independently on appeal. See State v. Krueger , 2008 WI App 162, ¶7, 314 Wis. 2d 605, 762 N.W.2d 114.
¶17 Burks argues that Kurtz impermissibly vouched for E.G. when he called her explanation of purchasing heroin from Burks "very believable." Burks ignores the context of Kurtz's testimony. Kurtz testified that as a part of the investigation into Karboski's death, he identified E.G., who then voluntarily agreed to cooperate with the investigation. Kurtz stated that E.G.'s account of her drug purchases, her interaction with Karboski, and her association with Burks matched the information found on her phone. Because Kurtz found E.G. "very believable," he set E.G. up to buy heroin from Burks, ultimately leading to Burks's arrest. Contrary to Burks's argument, Kurtz did not tell the jury that E.G.'s testimony would be credible. Rather, Kurtz described the investigation into Karboski's death, E.G.'s role in the investigation, and the process of apprehending Burks. Kurtz's testimony did not violate the Haseltine rule.
II. Sentencing
¶18 Burks also contends that his trial counsel was ineffective for failing to object to the sentencing court's reliance on an impermissible factor. Specifically, Burks argues that the court "improperly sentenced Mr. Burks based upon the need to protect the community from doctors, pharmacists, and other systemic actors who had nothing to do with Mr. Burks." We disagree.
¶19 Review of a sentencing decision is limited to determining whether discretion was erroneously exercised. State v. Harris , 2010 WI 79, ¶30, 326 Wis. 2d 685, 786 N.W.2d 409. A sentencing court erroneously exercises its discretion when it actually relies on a clearly irrelevant or improper factor. State v. Alexander , 2015 WI 6, ¶17, 360 Wis. 2d 292, 858 N.W.2d 662. "A defendant bears the burden of proving, by clear and convincing evidence, that the sentencing court actually relied on irrelevant or improper factors." Id. When determining whether the sentencing court erroneously exercised its discretion, we must "review the sentencing transcript as a whole, and ... review potentially inappropriate comments in context." See Harris , 326 Wis. 2d 685, ¶45. We decide as a matter of law whether a factor is irrelevant or improper. Cf. State v. Loomis , 2016 WI 68, ¶31, 371 Wis. 2d 235, 881 N.W.2d 749.
¶20 Burks fails to establish that the sentencing court actually relied on its comments about the opioid epidemic, addiction, and the medical and pharmaceutical industries when rendering its sentence. Indeed, the court stated that those comments "have[ ] nothing to do with" Burks. The postconviction court clarified that the sentencing court held Burks responsible for his role in profiting from "the market of addiction," and that the sentencing court "intended to punish [Burks]" for his particular role in Karboski's death. The sentencing court also sought to protect the public by "remov[ing] [Burks] from the chain of distribution" and to "deter others from preying upon [others in] the community," namely those with addictions. See State v. Fuerst , 181 Wis. 2d 903, 915, 512 N.W.2d 243 (Ct. App. 1994) (A postconviction court has an opportunity to explain its sentencing remarks in postconviction proceedings.). The sentencing court shared its opinions while discussing the seriousness of the crime and the need to protect the community, which are proper factors for consideration. See State v. Davis , 2005 WI App 98, ¶13, 281 Wis. 2d 118, 698 N.W.2d 823 (During sentencing, the sentencing court must consider three primary factors: (1) the seriousness of the crime; (2) the defendant's character; and (3) the need to protect the public.). Accordingly, the sentencing court properly exercised its discretion.
¶21 For the foregoing reasons, we affirm the judgment of conviction and the order denying Burks's motion for postconviction relief.
By the Court. -Judgment and order affirmed.
Not recommended for publication in the official reports.

"First-degree reckless homicide by delivery of a controlled substance was created as a specific type of criminal homicide to prosecute anyone who provides a fatal dose of a controlled substance.... The legislature developed this law, often referred to as the Len Bias law, in the wake of the tragic death of a University of Maryland basketball star by the same name from a cocaine overdose." See State v. Patterson , 2010 WI 130, ¶37, 329 Wis. 2d 599, 790 N.W.2d 909.

The record indicates that the "good shit" was heroin laced with fentanyl.

The sentencing court stated:
I'm quite sure that you knew what was in the stuff that you were selling....
It's got to stop. All of this has to stop, and there are a number of ways to deal with this. First of all, having nothing to do with Mr. Burks we need to stop the nexus that addicted people who die from these substances; and that is, to keep a closer eye on doctors who are over-prescribing to have some laws that allow the community, the government, the state, the feds to do something about doctors who claim that it's just their following their Hippocratic oath to keep people out of pain.
A lot of this is the doings of the pharmaceutical industry of the AMA....
....
I don't want to get into a significant rant about the rest of this, but it is something that has bothered me for years about how these drugs that were supposed to assist people at the end of their lives ... to make people's lives easier and in the end stages of cancer, bone cancer.
Now, it's being passed around like candy by doctors if you have a tooth ache or if you have a hang nail or if you have knee surgery.
And people become addicted. They can't afford the pills. They start on cheaper matters or cheaper things, street opiates in this case Fentanyl, heroin. Heroin in most instances. And then people fill in to provide that, to make a profit off of it.
I am not sure that if Mr. Burks wasn't involved in the sale of heroin that Nick Karboski wouldn't have overdosed anyways, but that doesn't-It doesn't matter. Because whoever would have provided him with the drugs in the future would be just taking the place of Mr. Burks, and that person would have been equally responsible for selling this dangerous drug.

Although the same judge presided over the trial, sentencing, and Burks's postconviction motion, we refer to each court separately for ease of understanding the various stages of Burks's case.