PER CURIAM.
¶1 Lorne Young appeals from a judgment convicting him of homicide by negligent handling of a dangerous weapon and from an order denying his motion for postconviction relief.[1] Young claims he is entitled to have his sentence modified either because: (1) the circuit court treated an argument made by Young's counsel as a reflection on Young's character (i.e., the court considered an improper factor); or (2) the court was not presented with recent research regarding brain development into emerging adulthood (i.e., there is now a new factor for the court to consider). We reject both contentions.
BACKGROUND
¶2 The homicide charge was based upon an incident in which Young shot and killed Kyle Ross-his sister's boyfriend-with a hunting rifle Young had grabbed from his truck after being approached by Ross. There were conflicting accounts as to how the rifle discharged. Young claimed he had grabbed the rifle "to use as an impact weapon to defend himself" and that it discharged when it hit the door of the truck after Ross tried to grab it. Young's sister told the police that Young had raised the rifle to his shoulder and fired one shot while Young and Ross were arguing outside the truck, and she told Ross's father that Young had shot Ross while Ross's hands were up.
¶3 At the sentencing hearing, the State first reminded the circuit court that, as part of the plea agreement in which the charge had been reduced from first-degree intentional homicide, Young had agreed not to argue against a maximum sentence recommendation by the State. The State went on to support its recommendation for a maximum sentence by arguing that the crime represented a vicious and aggravated overreaction to the situation, just as Young had previously overreacted as a juvenile by making a bomb threat at his school. The State then argued that Young revealed his character when, notwithstanding the plea agreement as to the sentence recommendation, he told the presentence investigation (PSI) author he thought jail time followed by probation would be an appropriate sentence. The State further argued that Young had demonstrated his character to be "despicable" by advising his lawyer to seek an offset in the restitution award for donations the victim's family had received from the community. The State also noted that the PSI recommended the highest available sentence set forth in the agency's grid, based upon categorizing the offense as aggravated and Young's risk of reoffending as high.
¶4 When Young's attorney addressed the circuit court, she clarified that she, and not her client, was responsible for the argument made in Young's sentencing memorandum that restitution be offset. Young chose not to exercise his right of allocution and the defense did not make a specific sentence recommendation.
¶5 The circuit court then engaged in a lengthy discussion of the severity of the offense and the character of the offender, in conjunction with the court's expressed sentencing objective of the need to protect the public. Among its comments as to the severity of the offense, the court stated:
The apparent interaction that occurred that day is difficult to reconcile from the standpoint of the outcome compared to the genesis of what was going on. It's hard to reconcile simply picking up your sister who's distraught and driving in a car and then having an interaction with a boyfriend that's running towards the car with no sign of being armed, other than perhaps at its worst upset and angry at something, to pulling out a deer rifle and having someone killed. It's tough to reconcile all that.
....
There was no fair reading of what appears to have happened that day that could justify any reason why a reasonable person would grab a gun, loaded or unloaded, under these circumstances when there were any number of very logical, very appropriate, and, in fact, I would say necessary alternatives, none of which were exercised. Mr. Young went to DEFCON 1 right away. And for those of you who don't understand that reference, it means you-you decided to use judgment with the ultimate weapon at your disposal leading to this. So yes, this is no accident. No one-I don't think [anyone] of reasonable mind could say it's an accident. Gun accidents occur when you're cleaning a gun in your house and it goes off and shoots somebody. That's an accident. An accident is when you're aiming at a whitetail deer and you miss it and it goes through someone's house and kills somebody or hits somebody. That's an accident. Pulling a gun out in-in the heat of passion when you think someone's mad at you, that's not an accident. That's not an accident. Now, it doesn't necessarily mean it has to be negligent, but in this case it was. And it was the type of negligence and gross negligence that carries with it a criminal penalty.
....
And the Court has not been given a good explanation as to how this whole thing could have degenerated so quickly to the point of, Number 1, feeling you even have to pull out a firearm. Number 2, whether you knew the gun was loaded or not. It's painfully obvious from the facts that you knew the gun was loaded at one time. Now, whether or not you had all the time in the world to unload it, I don't know. It's a bolt action, you know, which means that, you know, somewhere along the line you took some action to place a round in the chamber. At some point you did. Whether it was days beforehand or not, but you can't change the laws of physics. There was a round in the chamber. And when you pull the trigger, it gets fired and it shoots out. In this case it killed somebody. And the only thing I've heard with an explanation is that well, you know, I was going to use it as a bat or some type of a nonlethal weapon or something. So I haven't heard anything or the Court hasn't been satisfied that there's a good explanation that's been given as to how all of this could have occurred. Absent a good explanation that the Court can-or that anybody can truly grasp onto to say yeah, I get it, it's hard for anybody to grasp, in my opinion, the concept of yeah, I can perfectly see how it all happened. Your family, because they love you, probably will, but a detached objective observer has a hard time coming to grips with how we got from Point A to Point B and someone dead in a matter of moments. Moments.
The court concluded that the overall nature of the offense was "[a]ggravated from the standpoint that it was unnecessary, over the top, completely avoidable."
¶6 As to how Young's juvenile record related to his character, the circuit court noted:
He has a juvenile criminal record, which is somewhat unusual. Bomb scares are not exactly something that show up on people's criminal records very often. They're fairly rare, thank goodness, but it certainly is a unique page in the defendant's history. And I think the explanation by the State is a plausible one, that that type of activity suggests a lack of judgment. Even though it is one that was done at the time of youth, there's certainly-we can't negate everything that we do in our youth by saying well, I was just young and stupid, because if that was the explanation for anything, everybody was young and stupid, including me. I did my share of interesting things, but there's normal youthful indiscretions and then there's abnormal youthful indiscretions. Bomb scares are in the abnormal youthful indiscretions.
¶7 As to how Young's actions in this case related to his character and the need to protect the public, the circuit court stated:
Mr. Young, the people of Sawyer County, and, for that matter, anywhere else need to believe that their neighbors, and their family, and their friends, and the rest of the people in their community are going to exercise the type of reasonable judgment necessary to keep a community safe.
....
So the community has to ask themselves, is the next time that Lorne Young is faced with adversity, is he going to act this way again? Is he going to go into a fit of illogic nonsense and grab a gun when it's not necessary-to grab a loaded gun when it's not necessary? To put himself in a position where that gun can be used when it's not necessary? That's the question the community members ask. Maybe not necessarily in that context, but that's essentially it. Can they trust you when you come back to the community to exercise the type of judgment necessary so that people aren't afraid. They don't think you're a lunatic or a wingnut, because to be quite honest with you, you acted like a lunatic that day. An unnecessary lunatic. There's no evidence to suggest that your life was in danger. There's no evidence to suggest that imminent-imminent death was coming upon you or severe bodily harm. There might have been a fight coming, perhaps, but if someone says, you know, put up your dukes, you don't pull up the .45 and blow their head off. It's not reasonable. So that's the question that communities ask themselves when these types of things happen-or at least they should ask themselves. Are we going to trust the Lorne Youngs of the world to act reasonably when the chips are down? And when the chips were down with you, you acted anything but reasonable. You acted irrational and you acted stupid. And all of that has resulted in the death of someone, which there is no coming back from. Dead is dead.
....
The rights of the public in this particular case ... [are] to remain secure in the knowledge that their communities, and their open spaces, and their highways are going to be free of lunatics with guns running around because they can't control their emotions at any particular time. And as it applies, you know, to you, to exercise the type of judgment necessary when you are faced with a difficult situation that might become physical or certainly uncomfortable.
¶8 As to Young's acceptance of responsibility, the circuit court stated:
Well, I think it's fair to say you took responsibility. You didn't-you haven't said it's not you or that you didn't do it. There may be a degree of delay to a certain extent or perhaps painting this-your situation in the best light possible. That's not terribly unusual for humans to do that.
¶9 After noting that it did not know what type of rehabilitation might be necessary for Young to be able to exercise clear judgment in the future, the circuit court concluded:
So with that, the gravity of the offense is significant. A death occurred that should never have occurred. It's gross, criminal negligence with a very weak explanation as to why it happened and, therefore, it is the judgment of this Court considering the gravity of the offense, the need to protect the public from this type of activity that the maximum penalty in this case be imposed ....
¶10 Following the imposition of a bifurcated sentence with five years of initial incarceration and five years of extended supervision, the circuit court turned to other related sentencing matters. After setting the amount of restitution, the court stated:
All right. And, listen, you need to hear this, and I shouldn't have to say this to anybody, but you need to hear this. And everybody in this courtroom needs to hear this. You know, when these types of tragedies happen in small towns, it's not unusual for the community to rally to family support and give money voluntarily, or some way of a fundraiser, or some way of a community event. It happens. Everyone's probably attended one. That money does not replace what you need to pay. That money's for something else. Even asking for some type of credit for that is a moral defect. You need to think long and hard about it. Long and hard. That's repugnant. If the community wants to give 50 million dollars to this family for their loss, so be it. Doesn't change what you owe. You have a lot to learn. You have a lot to learn.
¶11 Young filed a postconviction motion seeking resentencing based upon the circuit court's comments that asking for an offset to restitution was "a moral defect" and "repugnant." In the alternative, Young sought resentencing based upon "[i]nformation regarding brain development in emerging adulthood." The court denied the motion and Young now appeals.
DISCUSSION
Improper Factor
¶12 When a criminal defendant seeks resentencing on the ground that the circuit court erroneously exercised its discretion by considering an improper factor, he or she must prove by clear and convincing evidence that: (1) the factor was in fact improper; and (2) the court actually relied upon it. State v. Harris , 2010 WI 79, ¶¶32-34, 326 Wis. 2d 685, 786 N.W.2d 409. An improper sentencing factor is one that is "totally irrelevant or immaterial to the type of decision to be made." State v. Samsa , 2015 WI App 6, ¶8, 359 Wis. 2d 580, 859 N.W.2d 149 (2014) (citation omitted). Actual reliance requires a showing that the court gave explicit attention or consideration to the factor, such that it "formed part of the basis for the sentence." State v. Tiepelman , 2006 WI 66, ¶14, 291 Wis. 2d 179, 717 N.W.2d 1. Under the clear-and-convincing-evidence standard, a reviewing court must evaluate potentially inappropriate comments in the context of the sentencing transcript as a whole, to determine whether it is "highly probable or reasonably certain" the circuit court actually relied upon an improper factor in fashioning the sentence. Harris , 326 Wis. 2d 685, ¶¶35, 45.
¶13 For the purposes of this appeal, the State concedes that "using trial counsel's restitution argument to form a judgment about Young's character would be an improper sentencing factor." Therefore, we need address only whether the circuit court properly determined Young failed to demonstrate actual reliance on that factor by clear and convincing evidence.
¶14 Young first points out that there is no "artificial line" between comments a circuit court makes before pronouncing sentence and after doing so. We agree that the timing of the court's comments may be considered, but is not dispositive, because a court may properly set forth additional justifications for a sentence after pronouncing it. Rather, the focus is on the nexus between the challenged comments and the sentence imposed.
¶15 Young next contends that the circuit court's comments stating the restitution argument was "repugnant" and showed a "moral defect" are directly linked to and reinforce the court's prior statement that Young had "acted in a manner that is inconsistent with a moral and civilized culture." Young argues that the challenged comments were therefore not "separate and distinct" from the court's sentencing rationale but, rather, were "part and parcel of its judgment about Young's character." We disagree.
¶16 The circuit court's comments regarding its view of the restitution argument and those regarding its view of Young's actions in shooting Ross go toward separate aspects of Young's character. As the extensive excerpts we have cited from the sentencing transcript show, the court spent a considerable amount of time explaining why it was concerned that Young's tendency to overreact to situations with threats and violence endangered the public. The court made repeated statements indicating that such a tendency was the basis for the sentence imposed, in conjunction with the severity and aggravated nature of the offense. The attempt by the defense to reduce the amount of restitution goes more toward Young's acceptance of responsibility than to his tendency to overreact to situations, and the court indicated that it was satisfied, overall, that Young had accepted responsibility within a normal range of human reaction. Moreover, it does not appear from the sentencing transcript as a whole that the court based its sentence in any part upon a failure by Young to accept responsibility for his actions.
¶17 We conclude it is not highly probable or reasonably certain that the negative character inference the circuit court drew about Young from counsel's restitution argument formed part of the basis for the sentence the court ultimately imposed. Therefore, the circuit court did not erroneously exercise its sentencing discretion based upon consideration of an improper factor.
New Factor
¶18 A new sentencing factor is a fact or set of facts highly relevant to the imposition of sentence but not known to the circuit court at the time of sentencing, either because the fact was not then in existence or because it was unknowingly overlooked by all the parties. Rosado v. State , 70 Wis. 2d 280, 288, 234 N.W.2d 69 (1975). A defendant bears the burden of establishing a new factor by clear and convincing evidence. State v. Harbor , 2011 WI 28, ¶49, 333 Wis. 2d 53, 797 N.W.2d 828. Whether a particular fact or set of facts constitutes a new factor is a question of law subject to de novo review. Id. , ¶¶33, 36. However, whether a new factor warrants a modification of sentence is a discretionary determination, to which we will defer. Id. , ¶33, 37. If this court determines that a fact or set of facts does not constitute a new factor, we need not examine the circuit court's exercise of discretion. Id. , ¶38. Conversely, if the circuit court has determined that a particular set of facts would not warrant sentence modification, we need not determine whether those facts constitute a new factor as a matter of law. Id.
¶19 Here, Young contends that the circuit court and parties unknowingly overlooked highly relevant scientific research about brain development in young or "emerging" adults. However, we are not persuaded that the research Young cites was either "unknowingly overlooked" or "highly relevant" to the imposition of the sentence in this case.
¶20 First, Young's postconviction motion does not make any allegation that trial counsel was unaware of the brain development research in young adults or otherwise explaining why trial counsel chose not to present evidence on the topic of such brain development. Given that trial counsel was bound by a plea agreement not to argue against the State's recommendation for the maximum sentence, the decision not to present evidence on brain development could have been a deliberate choice to avoid undermining the plea agreement by appearing to argue for a lesser sentence. Therefore, we have no factual basis to conclude that the issue was "overlooked."
¶21 Next, Young cites four articles in support of his contention that the terrible judgment he exhibited in this incident "is better explained by a 'maturity gap' resulting from still-developing brain capacity rather than by the existence of a pervading weakness or flaw in his character." However, we are not persuaded that any of the cited articles sufficiently support that proposition so as to establish it as a fact highly relevant to sentencing.
¶22 In the first cited article, Jeffrey Arnett proposes a new stage of development called "emerging adulthood." See Jeffrey J. Arnett, Emerging Adulthood: A Theory of Development from the Late Teens Through the Twenties , 55 AM. PSYCHOLOGIST 469 (2000). Arnett describes this stage of development as the period of time between adolescence and adulthood when individuals in industrial societies where marriage and parenthood are typically delayed may engage in high-risk behaviors-including unprotected sex, substance abuse, and driving at high speeds or while intoxicated-as part of the exploration of their identities before being constrained by the normatively expected responsibilities of adulthood. This article does not discuss neurological brain development at all. Instead, it focuses on cultural factors influencing behavioral development. Moreover, given that Young was married at the time of the offense, it is not even clear whether he would have fit within the "emerging adulthood" stage of life described by Arnett.
¶23 The second cited article summarizes some recent behavioral and neural findings on cognitive capacity in "young adults." See Alexandra O. Cohen, et al., When Does a Juvenile Become an Adult? Implications for Law and Policy , 88 TEMPLE L. REV. 769 (2016). In particular, members of the MacArthur Research Network on Law and Neuroscience conducted a study showing that, relative to control groups comprised of adolescents aged thirteen to seventeen and adults aged twenty-two to twenty-five, young adults aged eighteen to twenty-one showed diminished cognitive capacities similar to the adolescent group when they are in emotionally charged situations. The study did not undertake any further comparison between the group of adults aged twenty-two to twenty-five and other adults aged over twenty-five. Given that Young was twenty-three years old at the time of the offense, he would have been classified with the adult group who did not show diminished cognitive capacities in the study. Therefore, we do not see how this article supports Young's claim.
¶24 The third cited article cites research on both brain development and the numerous social challenges that young adults (and in particular, "young men of color with little schooling") face while transitioning into adult roles, in support of a proposal that "the age of juvenile court jurisdiction be raised to at least 21 years old with additional, gradually diminishing protections for young adults up to age 24 or 25." Vincent Schiraldi, et al., Community-Based Responses to Justice-Involved Young Adults , NEW THINKING IN COMMUNITY CORRECTIONS , 8-9, 15 (Harvard Kennedy School and National Institute of Justice, 2015). The article also discusses a series of other "age-responsive" measures that could be implemented in the justice system, including more diversion programs, more liberal granting of bail, specialized housing for detained young adults, shorter sentences, more community-based rehabilitative programs during supervision, more incentivized case plans, and increased confidentiality and expungement options. Id. at 9-15. The stated goal of these proposals is "to promote the process of human development and the transition to stable adult roles." Id. at 15. However, rehabilitation was not a primary basis for the circuit court's imposition of the sentence in this case, and the majority of the social development factors discussed in the article do not appear to apply to Young, limiting the article's relevance to Young's sentence.
¶25 The fourth cited article similarly cites both neurological and social environment research on behavioral and cognitive development in young adults aged eighteen to twenty-five, in support of four proposals aimed at "lower[ing] recidivism rates and incarceration costs for nonviolent, first-time, emerging adult offenders." Melissa S. Caulum, Note, Postadolescent Brain Development: A Disconnect Between Neuroscience, Emerging Adults, and the Corrections System , 2007 WIS. L. REV. 729, 733 (2007). The proposals include judicial education on emerging adult development; education and work programs for emerging adult prisoners; re-entry programs focused on individualized counseling; and specialized programming for emerging adult inmates. Id. Again, this article has limited relevance to Young's sentence because he was not being sentenced for a nonviolent offense, and the rehabilitative programs proposed in the article were not available options for the circuit court to impose.
¶26 Finally, none of the articles Young cites necessarily compel the inferences he contends should be drawn from them-namely, that "Young's failure in judgment can be explained as an artifact of his age, not a deep-seated character flaw" and, therefore, "he will not lack proper judgment in the future and will not pose an on-going danger to the public." That is, having a flawed character is not mutually exclusive from having a still-developing brain. We conclude that the research Young presented to the circuit court did not constitute a new sentencing factor.
¶27 As noted in a footnote above, we direct that the judgment be modified to reflect that it was entered by Judge Anderson. With that modification, we affirm the judgment of conviction and postconviction order.
By the Court. -Judgment modified and, as modified, affirmed; order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5. (2017-18).

Although the judgment of conviction identifies the judge as the Honorable John M. Yackel-who presided over the plea hearing-the sentencing transcript indicates that the Honorable John P. Anderson presided over sentencing, and we presume that Judge Anderson also entered the judgment of conviction. We therefore direct that the clerk of the circuit court issue an amended judgment to reflect the correct judge.