COURT OF APPEALS
DECISION
DATED AND FILED

July 14, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP1935-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2017CF724**

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

AARON S. LAWRENCE,

    DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Racine County: FAYE M. FLANCHER, Judge. *Affirmed*.

Before Reilly, P.J., Gundrum and Davis, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM. Aaron S. Lawrence appeals from a judgment convicting him of one count of second-degree sexual assault of child and an order denying his postconviction motion. He contends that (1) his right to confront his accuser was violated by the introduction of a video recording of the victim's forensic interview, (2) his due process rights were violated at sentencing, (3) he was deprived of his right to present a defense at trial, and (4) trial counsel provided ineffective assistance at various stages of the proceedings. For the reasons that follow, we reject each of Lawrence's claims and affirm the judgment and order.

## BACKGROUND

¶2    Lawrence was charged with three counts of second-degree sexual assault of a child for sexually assaulting C.M., the fifteen-year-old daughter of his live-in girlfriend, S.M. The complaint alleged that Lawrence assaulted C.M. in their backyard on May 27, 2017 (count one), and again in their living room on May 29, 2017, where he directed her to perform oral sex on him (count two) and then performed oral sex on her (count three).

¶3    On the day of trial, the State extended a settlement offer that would require Lawrence to plead guilty to any one count in exchange for a recommendation of fifteen years of initial confinement followed by ten years of extended supervision. Following a *Ludwig*[1] colloquy, Lawrence rejected the offer.

---

[1] *State v. Ludwig*, 124 Wis. 2d 600, 369 N.W.2d 722 (1985).

¶4     The case proceeded to trial, and the State called five witnesses.  A school social worker testified that C.M. came to her office on the morning of May 31, 2017, and told her that Lawrence had sexually assaulted her by telling her to perform oral sex on him and then "took off her underwear and performed oral sex on her."  Police were notified of C.M.'s report.

¶5     Heather Jensen testified that she conducted a forensic interview of C.M. at the Child Advocacy Center (CAC).  A video recording of the interview was played for the jury without objection.

¶6     After the CAC video was played for the jury, C.M. took the stand.  In pertinent part, she testified that she and Lawrence had oral sex and that she could identify a scar on his penis.  After the assault was over, she "kind of collapsed" and "tossed the wipe" that Lawrence had given her to "clean [herself] up with in the corner."  She testified that her mother and grandmother had pressured her to change her testimony and called her a liar.  C.M. identified items of clothing that the police had collected from the family bathroom as the clothes she wore during the May 29 assaults.

¶7     Trial counsel cross-examined C.M. in detail about the alleged assaults and about her relationship with Lawrence.  C.M. admitted that Lawrence was the "disciplinarian," that he had "smacked [her] and made [her] lip bleed" about two weeks before the sexual assaults and that she was "angry" with him before she reported the assaults because he had banned her from having a boyfriend who "was the only person that I found a connection with at the time." She acknowledged that she did not tell her mother about the assaults and that she knew her school social worker was required to report the assaults to police.

¶8    A state crime lab analyst testified that she found DNA consistent with Lawrence on a baby wipe, on C.M.'s underwear, and on C.M.'s jeans. Amalyse was detected on the wipe, the underwear, and the jeans "indicating the possible presence of saliva." Amalyse "is presumptively saliva" "until somebody proves that it's something other than saliva."

¶9    Sergeant Joseph Spaulding testified that he investigated C.M.'s sexual assault complaint and arrested Lawrence. After waiving his *Miranda*[2] rights, Lawrence admitted that he had been alone with C.M. on the days the assaults allegedly occurred, but he denied having any sexual contact with C.M.

¶10    The State rested and the jury was excused for the day. Trial counsel told the circuit court that he expected to call S.M. (C.M.'s mother) as a witness. The prosecutor responded that she had "concern about [S.M.] testifying" because S.M. had previously shown up at her office "and regaled for 45 minutes" on a "character assassination" of C.M. The prosecutor noted that S.M. "was not present at any of the sexual assaults" and asked the court "to warn [S.M.] she's not allowed to call [C.M.] a liar." The prosecutor stated that if S.M. inappropriately attacked C.M.'s character, she would "definitely ask[ ] for a mistrial."

¶11    Trial counsel made an offer of proof that S.M.'s testimony would include her "recollections" about the days of the alleged assaults and that C.M. made "no disclosures to her." Counsel admitted that he was concerned that he could not "control her" testimony. He said that he had contemplated having S.M. testify about the scar on Lawrence's genitals, but was "really leery" because he

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

was aware "she wants to go into a lot more detail about the scar than I would necessarily want." Counsel explained that he was "trying to take everybody's concerns into" consideration and was "trying not to (a) mistry the case and (b) not have a problem later like why didn't I call her." The circuit court said it would conduct a colloquy with S.M. before she testified to "let her know that any character assassination upon her daughter will absolutely not be tolerated" and could result in her being found in contempt and "taken into custody immediately."

¶12 The next day, trial counsel informed the circuit court that, after discussing with Lawrence "every possible benefit" of having S.M. testify, "and weigh[ing] that against any detriments" and "problems that it could cause, as well as with opening doors or things along that line," the defense had decided not to call S.M. as a witness. Lawrence waived his right to testify and the defense rested.

¶13 The jury found Lawrence not guilty of counts one and two, but guilty of count three. At sentencing, the prosecutor recommended the maximum, noting that the jury's verdict on count three was supported by DNA evidence, that C.M. had "stood up" to "pressure" from her mother and grandmother to "recant," that Lawrence had a long criminal history, and that he failed to take responsibility for his actions, instead blaming C.M. Lawrence requested that the circuit court withhold sentence and order probation. The court imposed the maximum sentence of forty years, with twenty-five years of initial confinement followed by fifteen years of extended supervision, explaining that "anything else" would unduly minimize this "horrific crime."

¶14 Lawrence filed a motion for postconviction relief, alleging in relevant part four claims: (1) he was denied his right to confront witnesses when the court allowed the CAC video into evidence "without having conducted the

statutorily required admissibility hearing or providing timely notice," (2) he was denied due process "when the State requested and the Court imposed an unreasonable trial penalty" at sentencing, (3) he was denied his right to present a defense when the court and the State "intimidated [S.M.] into not testifying at trial," and (4) he was denied the effective assistance of counsel. Following an evidentiary **Machner**[3] hearing, the circuit court denied the postconviction motion. Lawrence appeals.

## DISCUSSION

*The circuit court properly admitted the video recorded interview of C.M. at trial.*

¶15 The State filed a notice of intent to introduce the video of C.M.'s forensic interview under WIS. STAT. § 908.08. It is undisputed that the notice was filed late, after the statutory deadline. At a hearing before the circuit court, the State presented its offer of proof. Trial counsel did not object to the video's admissibility and the court ruled that the video could be shown to the jury so long as C.M. was "available for cross-examination." Lawrence argues that allowing the jury to view the video violated his constitutional right to confront his accuser. We reject his claim for two reasons.

¶16 First, as argued in the State's brief, Lawrence forfeited this claim by failing to object at trial. *State v. Ndina*, 2009 WI 21, ¶30, 315 Wis. 2d 653, 761 N.W.2d 612. Though forfeiture is a doctrine of judicial administration, we have no inclination to overlook it where, as here, trial counsel made a strategic decision

---

[3] *State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979) (where a defendant claims he or she received the ineffective assistance of trial counsel, a postconviction hearing "is a prerequisite … on appeal to preserve the testimony of trial counsel").

not to object. *See **State v. Gary M.B.**,* 2004 WI 33, ¶11, 270 Wis. 2d 62, 676 N.W.2d 475 ("A defendant cannot create his own error by deliberate choice of strategy and then ask to receive benefit from that error on appeal.") (citation omitted). As counsel explained at the postconviction hearing, he affirmatively decided not to object to the video's admission because it furthered the defense's strategy of portraying C.M. as "promiscuous," allowed him to more effectively cross-examine C.M., and opened the door to otherwise unavailable areas of questioning.

¶17 Second, Lawrence's confrontation argument fails on the merits. It is well established that the admission of a child's statement under WIS. STAT. § 908.08 does not violate a defendant's right to confrontation so long as the child-victim is available for cross-examination. *State v. James*, 2005 WI App 188, ¶¶9-11, 285 Wis. 2d 783, 703 N.W.2d 727. There is no dispute that C.M. testified at trial and, as stated by the postconviction court, "was subjected to a very rigorous cross-examination" by trial counsel. As such, the admission of the video does not implicate the confrontation clause.

¶18 We reject Lawrence's efforts to cast as a constitutional confrontation violation the circuit court's alleged failure to strictly comply with the provisions of WIS. STAT. § 908.08. His complaints about untimely notice and the sufficiency of the court's findings at the admissibility hearing do not alter the fact that C.M. testified in person at trial.

*Lawrence's due process rights were not violated at sentencing.*

¶19 Lawrence contends that he was denied due process because the circuit court sentenced him more harshly for exercising his right to a jury trial. *Kubart v. State*, 70 Wis. 2d 94, 97, 233 N.W.2d 404 (1975) ("A defendant cannot

receive a harsher sentence solely because he has availed himself of the important constitutional right of trial by jury.").

¶20     Sentencing decisions are within the circuit court's discretion and this Court's review of that sentence is limited to whether the court erroneously exercised that discretion. *State v. Gallion*, 2004 WI 42, ¶17, 270 Wis. 2d 535, 678 N.W.2d 197.   A circuit court erroneously exercises its discretion if it actually relies on irrelevant or improper factors. *State v. Harris*, 2010 WI 79, ¶66, 326 Wis. 2d 685, 786 N.W.2d 409.   To establish error, it is the defendant's burden to prove by clear and convincing evidence that the sentencing court relied on an improper factor. *Id.*

¶21     We find no merit to Lawrence's argument.   There is no evidence in the record that the circuit court imposed a harsher sentence solely because Lawrence exercised his constitutional right to a jury trial.   Indeed, the sentencing court never even mentioned Lawrence's decision to proceed to trial.   Rather, the court properly focused on the primary sentencing factors including the severity of the crime, Lawrence's character, and the need to protect the community.   *Id.*, ¶28. *See also Gallion*, 270 Wis. 2d 535, ¶¶39-46.   The court described the crime as severe, noting the horrific effect on C.M., who had considered Lawrence a "father figure."   In terms of character, the court considered that despite inculpatory DNA evidence, the PSI writer reported that Lawrence "denied the offense completely," and blamed C.M. for "trying to separate him and his fiance" and for being "overly mature and overly sexualized for her age."   The court found Lawrence's attitude toward the offense particularly troubling in light of his long criminal history, which included an adjudication for first-degree sexual assault of a child who Lawrence referred to as "a crock of shit."   Because the conviction for assaulting C.M. was Lawrence's "second involvement in the criminal justice system for a

sexually deviant offense" involving a child, the court found that he was "in clear need of sex offender treatment," and posed "a threat to the community." Taking into consideration all of the sentencing factors, the court determined that the maximum sentence was warranted to avoid minimizing this "horrific crime." This constitutes a proper exercise of discretion.

¶22 Lawrence acknowledges that the circuit court considered the *Gallion* factors at sentencing and does not allege that the sentencing court referenced his decision to go to trial. Instead, he makes the somewhat convoluted argument that the State recommended the maximum penalty because Lawrence elected to proceed to trial, and that because the court actually imposed the maximum, "the only reasonable explanation" for its sentence is that it "also chose to punish Lawrence for exercising the right to jury trial." We are not persuaded.

¶23 First, the transcript indicates that the State's sentencing recommendation was based on the severity of the crime, not on punishing Lawrence for his exercise of a constitutional right. The prosecutor emphasized the evidence of Lawrence's DNA on C.M.'s clothes and the wipes that C.M. testified he told her to use to clean up after performing oral sex, and described the detrimental effects of the assault on C.M., including her estrangement from her family. As the prosecutor further explained at the postconviction hearing, she also considered the maximum sentence appropriate based on details that came out in C.M.'s trial testimony and because having to testify and relive the events was difficult for C.M. This is entirely proper and distinguishable from the concept of punishing Lawrence for exercising a constitutional right.

¶24 Second, as noted by the postconviction court, the sentencing transcript "speaks for itself" and reveals that the court considered the trial

testimony, PSI and arguments of counsel, and addressed all of the required *Gallion* factors. To the extent the sentencing court discussed Lawrence's refusal to admit guilt or accept responsibility, the comments were made in the context of discussing the proper sentencing factors and did not suggest that the court was imposing a harsher penalty to punish Lawrence for exercising a constitutional right.

*Lawrence was not deprived of his right to present a defense.*

¶25 Lawrence argues that his right to present a defense was violated because the circuit court "improperly restricted" S.M.'s testimony and the prosecutor "intimidated Lawrence into not calling her as a witness." We disagree.

¶26 Lawrence forfeited this claim by not objecting at trial. *See Ndina*, 315 Wis. 2d 653, ¶30. Rather, trial counsel informed the circuit court that in consultation with Lawrence, the defense had decided not to call S.M. as a witness because of concerns that she would not testify within the bounds of the rules of evidence and because her testimony was unnecessary. As a result, the circuit court never actually ruled on the permissible scope of S.M.'s testimony.

¶27 For similar reasons, Lawrence's arguments fail on the merits. Again, the circuit court never actually restricted the scope of S.M.'s testimony because trial counsel decided not to call her as a witness. To the extent the prosecutor argued and the court implicitly ruled that S.M. could not permissibly assault C.M.'s character, this was a proper evidentiary ruling.

*Trial counsel did not provide ineffective assistance of counsel.*

¶28  As he argued postconviction, Lawrence maintains that trial counsel provided ineffective assistance in three areas:  pretrial, during trial, and posttrial. The test for ineffective assistance of counsel has two prongs:  (1) a demonstration that counsel's performance was deficient and (2) a demonstration that the deficient performance prejudiced the defendant.  ***Strickland v. Washington***, 466 U.S. 668, 687 (1984).  To establish deficient performance, a defendant must show specific acts or omissions of counsel that were "outside the wide range of professionally competent assistance."  ***Id.*** at 690.  To satisfy the prejudice prong, the defendant must demonstrate that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  ***Id.*** at 694.

¶29  Whether counsel's actions were deficient or prejudicial is a mixed question of law and fact.  ***Id.*** at 698.  The circuit court's findings of fact will not be reversed unless they are clearly erroneous.  ***State v. Pitsch***, 124 Wis. 2d 628, 634, 369 N.W.2d 711 (1985).  However, whether counsel's conduct violated the defendant's right to effective assistance of counsel is a legal determination, which this court decides de novo.  ***Id.***  We need not address both prongs of the test if the defendant fails to make a sufficient showing on either one.  ***Strickland***, 466 U.S. at 697.

¶30  Lawrence claims that counsel performed deficiently before trial by failing to adequately communicate with him concerning trial strategy and preparation, including whether to object to the CAC video.  He also suggests that, had trial counsel spent more time with Lawrence and S.M., he would have realized

11

S.M.'s value as an impeachment witness and made a different offer of proof that "rebutted the State's intimidation tactics."

¶31 We decide this claim on the prejudice prong and conclude that Lawrence has not shown a reasonable likelihood that the jury would have acquitted him on count three absent these alleged deficiencies. As found by the postconviction court, the video enabled trial counsel to vigorously cross-examine C.M. "about things that would have been prohibited had the [video] not been introduced." Trial counsel testified that he wanted the jury to see the video and was pleasantly surprised when the State sought its admission. Counsel explained that the video supported the "entire defense" with C.M.'s admissions of "multiple, multiple bad acts," as well as "prior sexual acts" and "promiscuousness," and that without the video, "the majority of [his] cross[-]examination would have been rendered moot." As to the claim that further investigation would have led trial counsel to call S.M. as a witness and resulted in an acquittal on count three, Lawrence's arguments are speculative and conclusory. The issue of S.M.'s testimony was thoroughly hashed out on the record at Lawrence's trial and his postconviction hearing. Counsel explained that the low probative value of S.M.'s testimony along with her credibility problems and stake in the case led him to conclude that any benefits of her testimony were outweighed by "the potential bad things that could happen." Postconviction, Lawrence did not present any evidence that would have changed this calculation. He certainly has not shown a reasonable probability that her testimony would have made a difference in the outcome of the trial, particularly in light of the DNA evidence supporting count three.

¶32 Next, Lawrence claims that counsel was deficient at trial for "failing to document the State's final plea offer on the record" and request a hearing on this purported offer. Postconviction, Lawrence testified to his belief that after he

rejected the State's final plea offer pursuant to the ***Ludwig*** colloquy, the State extended an offer calling for ten years of initial confinement that was not put on the record. However, both trial counsel and the prosecutor testified that the on-the-record offer for fifteen years of initial confinement was indeed the State's final offer. As such, Lawrence's claim is directly contradicted by trial counsel, the prosecutor, and the trial transcript, and trial counsel was not deficient for failing to place a nonexistent offer on the record.

¶33 Lawrence also asserts that trial counsel provided ineffective assistance after trial, by not discussing with him the PSI or the defense's sentencing recommendation for probation. Lawrence has not shown deficient performance because the testimony at the postconviction hearing refutes his claim. Lawrence testified that he received a copy of the PSI a day or two before sentencing and discussed the PSI's contents and his sentencing request for probation with trial counsel. Trial counsel testified that: he met with Lawrence before sentencing to go over the PSI, Lawrence "maintained his innocence" and did not want to postpone sentencing, Lawrence told him he had no additions or corrections to the PSI, counsel told Lawrence "many times" that recommending probation and time served was "preposterous," and Lawrence "ordered" him to request probation.

¶34 Finally, we reject Lawrence's argument that the cumulative effect of trial counsel's alleged errors entitles him to a new trial. We have concluded that none of Lawrence's ineffective assistance claims are viable. Whether viewed separately or together, the acts and omissions complained of do not undermine our confidence in the outcome of Lawrence's trial. "Zero plus zero equals zero." ***Mentek v. State***, 71 Wis. 2d 799, 809, 238 N.W.2d 752 (1976).

13

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.