COURT OF APPEALS
DECISION
DATED AND FILED

August 31, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1827-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF464

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

JEREMY DAVID MEYER,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Walworth County: PHILLIP A. KOSS, Judge. *Modified and, as modified, affirmed.*

Before Gundrum, P.J., Neubauer and Grogan, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Jeremy David Meyer appeals from a judgment of conviction, entered following a jury trial, for delivery of heroin and theft from a corpse.[1] The jury acquitted Meyer of first-degree reckless homicide, but convicted him of the lesser-included delivery-of-heroin offense. Meyer raises two sentencing issues. First, he argues the circuit court erroneously exercised its sentencing discretion by sentencing him more harshly based on the court's belief that Meyer had in fact delivered the drugs that killed the victim. Second, Meyer argues the court erroneously imposed restitution for the victim's funeral expenses.[2] We reject Meyer's arguments, modify the judgment of conviction, and affirm the judgment as modified.[3]

## BACKGROUND

¶2 A jury acquitted Meyer of first-degree reckless homicide, but convicted him of the lesser-included offense of delivery of heroin, as well as theft from a corpse. The victim, Joshua Syck, was found deceased by Meyer and Syck's girlfriend, Jessica Gault, in a portable toilet near Syck's residence in the evening hours on September 2, 2017. A baggie and a syringe were found near his body. The syringe contained the controlled substances fentanyl and acetyl fentanyl.

---

[1] Meyer was also found guilty of possession of drug paraphernalia and pled to child neglect, for which he was given concurrent jail sentences. Those convictions are not at issue on appeal, and we do not further address them.

[2] We requested and received supplemental briefing on this issue.

[3] Both the delivery and theft convictions were as a party to a crime. The judgment of conviction fails to reflect party-to-a-crime liability for the delivery offense. We therefore modify the judgment of conviction accordingly. *See* WIS. STAT. RULE 809.09 (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

¶3     According to the medical examiner, Syck died of a mixed drug interaction involving fentanyl, acetyl fentanyl, methadone, and morphine. Fentanyl is usually mixed with heroin but is considerably more potent. Syck had a "pretty high level" of fentanyl in his tissues, a small amount of morphine, and an unquantified amount of acetyl fentanyl.[4]  The methadone was measured at 270 micrograms per liter, which the medical examiner testified was "a pretty common level to see in people who are either using fentanyl under prescription or in other circumstances."  The defense expert testified, however, that as little as 140 micrograms per liter of methadone can be fatal.  In any event, the medical examiner testified that the drugs all "play[] off" one another and were having the same effect:  slowing down the respiratory and nervous systems.

¶4     Gault testified that the night prior to Syck's death, she discovered Syck sitting in an odd position on the toilet in their residence.  As soon as she saw that Syck had his belt in the bathroom, she knew he had been using heroin.  She searched his pockets and discovered a syringe and a metal tin.  Syck admitted to her that he had used heroin, claiming he had gotten it from someone in the nearby Garden Apartments.

¶5     Gault testified she heard Syck leave the residence after she went to bed, but he had returned by the time she woke up.  Syck made arrangements with Meyer to pick him up in a nearby parking lot.  He left the residence on foot to the meeting spot, but Meyer told Gault that Syck never arrived.  Surveillance video

---

[4] Acetyl fentanyl is a laboratory-produced compound that is similar to fentanyl.  It has no medical use and the amount present is therefore not quantified by the toxicology lab.

showed Syck entering the portable toilet near the parking lot, where he remained until he was discovered by Meyer and Gault.

¶6    Jennifer Klefbohm, a friend of Meyer's, accompanied him to Rockford to pick up heroin while Gault searched for Syck. She testified that Meyer told her during the trip that Syck had overdosed the previous night at the home Meyer shared with his girlfriend, Kori Kincaid. Klefbohm also testified that she was at Meyer's residence earlier on the evening of September 1, and Meyer told her that he had set aside a baggie of heroin for Syck. Klefbohm stated that after Syck's body was discovered, Meyer had given her a wallet that he later said was Syck's. Meyer told Klefbohm he took the wallet from Syck's body because "he knew that's where Josh kept his heroin and he didn't want to leave it there for them to find," as it could have his DNA on it.

¶7    Kincaid testified under a grant of immunity. She testified Syck had paid for her and Meyer to pick up heroin for him on September 1. Syck came to their residence late in the evening to pick it up. Kincaid denied that she saw Syck using heroin while she was present, but she acknowledged that he was behaving erratically and that she had told him to leave.

¶8    After the jury found Meyer guilty of theft from a corpse and the lesser-included offense of delivery of heroin, the circuit court ordered a presentence investigation report (PSI) and held a sentencing hearing. At the hearing's inception, defense counsel mentioned the PSI author's notation about "the seriousness of the offense resulting in someone's death" and reminded the court that the jury had not convicted Meyer of first-degree reckless homicide,

indicating that the jury was not convinced beyond a reasonable doubt that the delivery was a substantial factor in Syck's death.[5] The court replied:

> I'm obviously keenly aware of what the jury did. Certainly we're not sentencing on a homicide. However, the Court can consider acquitted conduct, and actually this wasn't an acquittal, it was just a lesser included.
>
> I'm keenly aware I think as well … why in my opinion they didn't convict, there certainly were some issues that you pointed out, but I think it still is a factor and it certainly applies to Count 2 [theft from a corpse].

The court declined to impose any limit on the victim impact statements regarding what matters the individuals could discuss, and some expressed their belief that Meyer had delivered the drugs that killed Syck.

¶9      The prosecutor recommended a total sentence of ten years' initial confinement and ten years' extended supervision. The defense strenuously objected to that recommendation, arguing the State was "asking for a homicide sentencing on a homicide it lost." The defense recommended eight and one-half years' probation with one year of conditional jail time.

¶10      The circuit court began its sentencing comments by acknowledging the tragedy of the situation. The court considered Meyer's criminal history, past behavior, personal characteristics, treatment history, and living conditions that jeopardized his children's health. It then stated that defense counsel correctly observed the sentencing hearing had "been treated by [Syck's] family as a sentencing for a homicide. Could one blame them? They listened to it."

---

[5] Defense counsel also articulated his concern with conflating the homicide charge and the delivery conviction in a letter sent the day prior to the sentencing hearing. Defense counsel revisited this in his argument, noting repeatedly that the tenor of the sentencing hearing was "like a visitation."

¶11    The circuit court rejected the notion that the jury absolved Meyer of culpability for Syck's death.  Rather, the court observed that there were "holes in the State's case" that led the jury to conclude that causation "wasn't proven beyond a reasonable doubt."  Later, the court stated, "As I said, I understand, I'm not sentencing him for a homicide, but I can't close my eyes that the culture you engaged in, Mr. Meyer, the culture you enthusiastically participated in caused Josh's death."  And before pronouncing sentence, the court reiterated that the law permitted it to consider acquitted conduct.

¶12    The circuit court found that probation would unduly depreciate the seriousness of the offenses, and it additionally emphasized the need to deter drug use and delivery.  Before pronouncing sentence, the court stated the sentence had to "reflect that there are times that more serious harm has taken place."  The court continued:

> And again nobody can say he didn't cause Josh's death, they just couldn't prove it.  And I don't know either.  And I'm not sentencing him for a homicide.  But I just want to make that very clear, and it keeps the family's legitimacy here; the same legitimacy that [the defense] can argue … the other way.
>
> And I don't think we need to moralize one way or the other.  It is a view [or] interpretation of facts that both sides are legitimately concerned about.

¶13    The circuit court then imposed two years' initial confinement and two years' extended supervision on the delivery conviction.  Meyer was sentenced to a consecutive four years' initial confinement and four years' extended supervision on the theft conviction.

¶14    The court determined restitution was appropriate, and Meyer requested a restitution hearing.  Meyer agreed to pay $20 to replace the wallet he

stole from Syck's body, but objected to the approximately $17,100 sought by Syck's family for his funeral expenses. The State filed an amended restitution request of approximately $11,300. In lieu of a hearing, the parties agreed to submit written argument to a court commissioner and stipulated that the "entire court record, including the transcripts of the trial and sentencing," could be used for purposes of determining restitution.[6]

¶15    The court commissioner regarded the relevant question as "whether or not there is a causal nexus between Mr. Syck's death and the actions of the Defendant." The commissioner concluded he was not bound by the jury's verdict on the reckless homicide charge, emphasizing that while the jury was tasked with finding guilt beyond a reasonable doubt, the "preponderance of the evidence" standard governed restitution determinations. Based upon the trial evidence, the commissioner concluded there was "a sufficient causal nexus" between Meyer's delivery of heroin to Syck and Syck's eventual death. The commissioner's award of Syck's funeral expenses to his family was adopted by the circuit court both by order and in an amended judgment of conviction. Meyer now appeals.

**DISCUSSION**

¶16    Meyer first contends that the circuit court erroneously exercised its sentencing discretion by "placing too much weight" on the conduct underlying the

---

[6] It appears a restitution hearing was conducted on December 17, 2019, but the transcript of that hearing is not in the appellate record. In any event, the stipulation reflected in the court commissioner's findings of fact and conclusions of law establishes that the "parties agreed that no testimony was required" and that the restitution issue could be decided based on the existing record.

reckless homicide charge.[7] A circuit court's discretion contemplates a process of reasoning. ***State v. Bolstad***, 2021 WI App 81, ¶11, 399 Wis. 2d 815, 967 N.W.2d 164. The three primary sentencing factors to consider are the gravity of the offense, the character of the defendant, and the need to protect the public. ***State v. Bobbitt***, 178 Wis. 2d 11, 14, 503 N.W.2d 11 (Ct. App. 1993). An erroneous exercise of discretion may be found when the sentencing court "gave too much weight to one factor in the face of contravening considerations." ***Id.***

¶17 In so arguing, Meyer does not dispute that the circuit court could take into account the conduct underlying the reckless homicide charge, even though the jury convicted him of only the lesser-included offense. *See **State v. Marhal***, 172 Wis. 2d 491, 503, 493 N.W.2d 758 (Ct. App. 1992). Consistent with the court's sentencing comments, a verdict of acquittal demonstrates only a lack of proof beyond a reasonable doubt and does not necessarily establish the defendant's innocence. ***Id.*** at 502.

¶18 As such, Meyer's argument essentially reduces to a numbers game. Indeed, he urges that it is "merely a matter of math in this case" to determine that the sentencing court placed too much weight on the conduct underlying the reckless homicide charge. He contends that of the sentencing court's 3,500-word pronouncement of sentence, approximately 2,000 words were "regarding the homicide of which the Defendant was acquitted." According to Meyer, this amounts to a per-se violation of ***Bobbitt*** and an erroneous exercise of discretion.

---

[7] Meyer uses the phrase "abuse of discretion." Our supreme court abandoned that terminology in 1992 in favor of "erroneous exercise of discretion." *See **Shirk v. Bowling, Inc.**,* 2001 WI 36, ¶9 n.6, 242 Wis. 2d 153, 624 N.W.2d 375.

¶19    We cannot agree with Meyer's numerical analysis, nor his more general argument that the circuit court unduly emphasized that Meyer was culpable for Syck's death.  Even assuming the validity of Meyer's counting, an erroneous exercise of discretion cannot be demonstrated merely by a word count.  Our review of the sentence looks to the totality of the court's remarks, *see State v. Stenzel*, 2004 WI App 181, ¶9, 276 Wis. 2d 224, 688 N.W.2d 20, and we employ a "presumption of reasonability consistent with our strong public policy against interference with the circuit court's discretion," *State v. Harris*, 2010 WI 79, ¶¶29-30, 326 Wis. 2d 685, 786 N.W.2d 409.

¶20    Reviewing the sentencing transcript under that framework, we do not perceive the circuit court to have placed unreasonable weight on the notion that Meyer was culpable for Syck's death.[8]  The court extensively discussed relevant factors, including Meyer's age, education, personality, character, and personal history.  It spent a considerable amount of time discussing how Meyer's actions appeared to be self-serving rather than those of a friend.

¶21    Nonetheless, the court noted that Meyer was not a violent criminal, and it lauded him for both his progress in treatment and his "excellent" demeanor.  The court told Meyer its sentence "reflects the good things you have done as well, trust me on that, and the steps that you have taken that your children need to rely on you."

¶22    The circuit court repeatedly stated it was not sentencing Meyer for a homicide.  While Meyer characterizes this as "lip service," the totality of the

---

[8] Notably, Meyer has not sought reversal based on an argument that inaccurate information was considered at sentencing.

9

court's comments supports the court's assessment of its own sentencing discretion. The court appropriately observed that the State had not proven causation at trial and it did not know, as a factual matter, whether the drugs Meyer supplied killed Syck. The court recognized the facts could give rise to conflicting views on the matter. However, it did fault Meyer for willingly immersing himself "in a dysfunctional[,] manipulative culture of controlled substances." And the court quite appropriately noted that "the culture you enthusiastically participated in caused Josh's death."

¶23   The circuit court here was given the unenviable task of fashioning a sentence for two crimes, one of which occurred immediately before the victim's death and one of which occurred immediately after his death, without running afoul of the rule that a court "may not sentence according to its desire to replace a jury's conclusion with its own." *Bobbitt*, 178 Wis. 2d at 18. We conclude the court struck an appropriate balance between acknowledging that Meyer was convicted only of delivery and also acknowledging the undeniable fact that the recipient of the drugs had suffered an overdose death soon thereafter. The overall length of the sentences, which were considerably shorter than the maximum penalties (and certainly short of the penalty for reckless homicide), support this conclusion.[9]

¶24   Finally, the circuit court adequately and reasonably explained why it imposed the longer of the two sentences for theft from a corpse. It was not, as

---

[9] Meyer received a bifurcated eight-year sentence for theft from a corpse, which was two years less than the maximum penalty for that offense. *See* WIS. STAT. §§ 943.20(1)(a) and (3)(e); 939.50(3)(g). He received a bifurcated four-year sentence on the delivery conviction, which was a Class F felony subject to a maximum penalty of twelve years and six months' imprisonment. *See* WIS. STAT. §§ 961.41(1)(d)1.; 939.50(3)(f).

Meyer claims, a stealth attempt to punish him for reckless homicide. Rather, the court acknowledged that the legislature deemed delivery the "more severe" offense, but it viewed the theft as "incredibly aggravated" because it was committed in an apparent attempt by Meyer to cover up his involvement in supplying Syck with drugs. This was a recurring theme in the court's comments: the notion that throughout his friendship with Syck, Meyer had the opportunity to change his life and that of his friend, and each time he instead acted selfishly to feed their addictions.

¶25 Meyer also challenges the restitution award of funeral expenses. Restitution is governed by WIS. STAT. § 973.20. Under that section, the court shall order the defendant to make full or partial restitution to any victim (or the victim's estate, in the case of death) for "a crime considered at sentencing." Sec. 973.20(1r). A crime considered at sentencing means "any crime for which the defendant was convicted and any read-in crime." Sec. 973.20(1g)(a). If a crime considered at sentencing resulted in death, the restitution order "may also require that the defendant pay an amount equal to the cost of necessary funeral and related services under [WIS. STAT. §] 895.04(5)." Sec. 973.20(4).

¶26 Meyer argues that because he was acquitted of the reckless homicide charge, it cannot be "a crime considered at sentencing" and the circuit court erred by imposing restitution for Syck's funeral expenses. He further argues that Syck's death cannot be viewed as the "result" of his delivery of drugs to Syck or his theft from Syck's corpse.

11

¶27 We review a circuit court's calculation of criminal restitution for an erroneous exercise of discretion.[10] *State v. Canady*, 2000 WI App 87, ¶5, 234 Wis. 2d 261, 610 N.W.2d 147. The restitution statute is interpreted broadly and liberally to allow victims to recover their losses as a result of a defendant's criminal conduct. *Id.*, ¶8 (citation omitted). Meyer is correct that before restitution can be ordered, a causal nexus must be established between the "crime considered at sentencing" and the damage sustained by the victim. *See id.*, ¶9.

¶28 Our supreme court elucidated the causal nexus requirement in *State v. Wiskerchen*, 2019 WI 1, 385 Wis. 2d 120, 921 N.W.2d 730. The crime under consideration is not limited to the facts necessary to establish the elements of the offense, but rather encompasses all facts and reasonable inferences concerning the defendant's activity related to the crime. *Id.*, ¶25. It is the victim's burden to show the defendant's criminal activity was a substantial factor in causing damage; that is, the defendant's actions must be the "precipitating cause of the injury" and the harm must be "the natural consequence[s] of the actions." *Canady*, 234 Wis. 2d 261, ¶9 (citation omitted).

¶29 Notably, restitution does not require proof beyond a reasonable doubt. "A victim has the initial burden to prove by a preponderance of the evidence that he or she sustained a loss as a result of a crime considered at sentencing." *State v. Muth*, 2020 WI 65, ¶16, 392 Wis. 2d 578, 945 N.W.2d 645 (plurality opinion). Although Meyer attempts to shore up the jury's acquittal by emphasizing that a jury is tasked to "search for the truth," *see* WIS JI—CRIMINAL

---

[10] To the extent review also involves interpretation and application of WIS. STAT. § 973.20, we apply a de novo standard of review. *State v. Wiskerchen*, 2019 WI 1, ¶16, 385 Wis. 2d 120, 921 N.W.2d 730.

140 (2019), the preponderance-of-the-evidence standard applicable in restitution proceedings dictates that the circuit court could make its own factual findings and reach its own conclusions based upon the evidence presented.

¶30    Here, the parties stipulated the trial record would form the factual predicate for restitution.  The most plausible view of the trial evidence is that Syck purchased $60 of heroin from Meyer on September 1.  He went to Meyer's residence to pick up the baggie and used enough heroin that Kincaid was afraid he was overdosing and kicked him out.  Syck went back to his residence, where Gault found him.  Syck had enough heroin left over that Meyer reached out and arranged to meet with Syck on September 2 to "borrow" some heroin for an individual that Meyer was with, even after Syck told Gault that he had thrown away the heroin.[11]  On his way to meet Meyer, Syck stopped in the portable toilet to inject himself with more narcotics.  And Meyer's actions upon finding Syck's body were those of an individual who believed that the drugs he supplied may have been fatal.

¶31    The evidence at trial, while compelling, was not bulletproof, and like the circuit court, we understand the jury's reluctance to impose criminal liability for reckless homicide.  The State acknowledges two alternative scenarios: that Syck received the fentanyl he was found with from someone other than Meyer, or that the methadone alone killed him.  These theories primarily rest on the facts that Syck was unaccounted for between the hours of approximately 2:00 a.m. and

---

[11] After Gault found Syck on the toilet in their residence, Syck claimed his use was a "one[-]time thing" and begged Gault to accompany him to a dumpster outside where he threw something in.  Gault testified it sounded like metal but she did not see what he threw away.

9:00 a.m. on September 2, and that after he left the residence to meet Meyer, Gault saw on a phone app that he was located at the Garden Apartments.[12]

¶32     While these hypotheses might find some minimal level of support in the record evidence, we agree with the circuit court that they do not represent the most plausible scenario. Syck suffered from back pain and told Gault that he was going to Meyer's on September 1 to pick up a pain pill. To the contrary, the record is clear that Syck was purchasing what he believed to be heroin. As the State lays out, even if Syck threw away the heroin Meyer provided, it is far more likely—particularly given the difficulty Syck had funding the $60 purchase—that he retrieved the heroin from the dumpster rather than scrounge up the money to buy new drugs. And, Syck had good reason to lie when he told Gault he bought the heroin from someone in the Garden Apartments. Gault had come to trust Meyer and was unaware he was a heroin addict, as Syck had falsely told Gault that Meyer stopped being his friend when Syck had used in the past.

¶33     In all, the State thoroughly discusses the evidence both for and against a conclusion that Meyer supplied Syck with the drugs that killed him. We agree with the State that the circuit court could reasonably conclude the preponderance of the evidence established that Meyer provided the drugs that caused Syck's death.

        *By the Court.*—Judgment modified and, as modified, affirmed.

---

[12] Gault testified that Syck left with his phone on the morning of September 2. Using Snapchat, Gault was able to see that Syck's phone appeared to be located at the apartment building across from theirs. He did not have a cell phone provider and received internet service from WiFi networks. Syck's cell phone was never located by police.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.